Dissent by Chief Judge THOMAS
OPINION
CLIFTON, Circuit Judge:
When a burglar alarm in a commercial building was triggered shortly before 11:00 p.m. on a Thursday night, San Diego Police Department officers responded. Accompanied by a police service dog, Bak, the officers inspected the building and found a door to a darkened office suite propped open. Unable to see inside the suite, one of the police officers warned: “This is the San Diego Police Department! Come out now or I’m sending in a police dog! You may be bitten!” No one responded. The officers suspected that a burglary might be in progress and that the perpetrator was still inside the suite. After he repeated the warning and again received no response, one of the officers released Bak from her leash and followed closely behind her as they scanned each room. As *1253 he entered one of the rooms, the officer noticed a person laying down on a couch. Bak leapt onto the couch. Within seconds, the officer called Bak off, and the dog returned to the officer’s side. The person on the couch was Plaintiff Sara Lowry. She had returned to the office after a night out drinking with her friends, and had accidentally triggered the alarm before falling asleep on the couch. During their encounter, Bak bit Lowry’s lip.
Based on these facts, Lowry filed suit against the City of San Diego under 42 U.S.C. § 1983, alleging that its policy of training its police dogs to “bite and hold” individuals resulted in a violation of her Fourth Amendment rights. The district court granted the City’s motion for summary judgment, concluding that Lowry had not suffered constitutional harm and that, even if she had, the City was not liable for her injury under Monell v. Department of Social Services of New York, 436’ U.S. 658, 694, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). We agree that the use of the police dog under these circumstances did not violate Lowry’s rights under the Fourth Amendment and thus affirm the summary judgment in favor of the City.
I. Background
A burglar alarm was triggered in a two-story office building in San Diego at approximately 10:40 p.m. on the night of Thursday, February 11, 2010. Three San Diego Police Department (SDPD) officers, Sergeant Bill Nulton and Officers Mike Fish and David Zelenka, along with Nul-ton’s police service dog, Bak, arrived at the scene within minutes of receiving the call to investigate a burglar alarm. Approaching the building, the officers did not see anyone leaving the building or surrounding area. On the second-story balcony of the building, they saw an open door.[1]
After scaling the ground-floor gate, the officers determined that the open door led to Suite 201. Outside the suite, Sergeant Nulton yelled loudly, “This is the San Diego Police Department! Come out now or I’m sending in a police dog! You may be bitten!”[2] No one responded. He waited between 30 and 60 seconds and repeated the same warnings. Again, there was no response.
Faced with an open door to a darkened[3] office suite, knowing that the burglar alarm had been triggered and that they had received no response to their warnings, the officers—who had arrived at the scene within minutes—suspected that a burglary might be in progress and that the intruder could be lying in wait. Nulton released Bak into the suite to start searching the offices. Nulton followed closely behind Bak and swept the area with his flashlight. When Bak and Nulton entered the last office to be searched, Nulton noticed a purse on the floor and, shining his *1254 flashlight against the office wall, spotted a person under a blanket on the couch. At about that moment, Bak jumped onto the couch and bit the person on the lip. Nulton immediately called Bak off, and Bak responded, returning to Nulton’s side.
The person on the couch was Sara Low-ry. Although the officers were previously unaware of her presence, Lowry had been asleep on a couch in an office within Suite 201, where she worked. She had visited a few bars in the area with friends that evening and consumed five vodka drinks. Around 9:30 p.m., she returned to her office and fell asleep on the couch. She woke up to use the bathroom, instinctively heading towards the bathroom she typically used during business hours, which was in a neighboring suite occupied by a separate company. In the process of entering the neighboring suite, she triggered the burglar alarm. She returned to her office and fell back asleep on the couch, where she was still located when Nulton and Bak entered the room. In their encounter, Bak bit Lowry’s upper lip, causing it to bleed. Officer Fish took Lowry to the hospital, where she received three stitches.
In this 42 U.S.C. § 1983 action, Lowry alleges that the City’s policy and practice of training police service dogs to “bite and hold” individuals resulted in a violation of her Fourth Amendment rights. It is undisputed that SDPD trains police service dogs to “locate and control persons on command” by finding a person, biting them, and holding that bite until a police officer handler commands the dog to release the bite. Police dogs may be left on the bite “until the suspect can be handcuffed by the handler and be safely taken into custody.” Prior to using a police service dog to search for a suspect, the City’s policy requires a handler to consider: “(1) the severity of the crime; (2) the immediacy of the threat; and, (3) if the subject is actively resisting arrest.”[4] When practical, handlers are expected to issue warnings before releasing a police service dog.
The district court granted the City’s motion for summary judgment. Lowry timely appealed. A divided three-judge panel of this court reversed the summary judgment and remanded for further proceedings. Lowry v. City of San Diego, 818 F.3d 840 (9th Cir. 2016). We granted the City’s petition for rehearing en banc. Lowry v. City of San Diego, 837 F.3d 1014 (9th Cir. 2016) (order).
II. Discussion
We review a district court’s grant of summary judgment de novo. Torres v. City of Madera, 648 F.3d 1119, 1123 (9th Cir. 2011). We must determine whether “taking the evidence and all reasonable inferences drawn therefrom in the light most favorable to the non-moving party, there are no genuine issues of material fact.” Id. In the absence of material factual disputes, the objective reasonableness of a police officer’s conduct is “a pure question of law.” Id. (quoting Scott v. Harris, 550 U.S. 372, 381 n.8, 127 S.Ct. 1769, 167 L.Ed.2d 686 (2007)).
Lowry alleges that the City’s policy of training its police dogs to “bite and hold” resulted in a violation of her constitutional right against being subjected to excessive force. The use of excessive force by a law enforcement officer may constitute a violation of the Fourth Amendment’s prohibition against unreasonable seizures of the person. Such a claim can be brought under 42 U.S.C. § 1983 and *1255 should be analyzed under the Fourth Amendment’s “reasonableness” standard. Graham v. Connor, 490 U.S. 386, 395, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989).
Lowry has not sued the police officers but only the City, asserting a single cause of action seeking to establish the City’s liability under Monell v. Department of Social Services of New York, 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). To prevail on her Monell claim, Lowry must establish that (1) SDPD’s use of Bak amounted to an unconstitutional application of excessive force, and (2) the City’s policy caused the constitutional wrong. Chew v. Gates, 27 F.3d 1432, 1439 (9th Cir. 1994) (citing Monell, 436 U.S. at 690-94, 98 S.Ct. 2018).
Lowry contends that summary judgment should not have been granted to the City because there were genuine disputes of material fact and because the district court abused its discretion in excluding evidence that could have established a genuine dispute of fact. She argues that the force used against her was unreasonable and excessive, in violation of the Fourth Amendment. She further asserts that the City’s policy regarding the use of police dogs was itself unconstitutional and that it caused her injury. We disagree.

A. Evidentiary Issues

Under Rule 56(a) of the Federal Rules of Civil Procedure, summary judgment should be granted “if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.” Lowry argues that the district court erred in granting summary judgment because there were genuine disputes of material fact. In determining whether the district court properly found that Lowry failed to raise genuine factual issues, we ask whether she “set forth specific facts showing that there is a genuine issue for trial.” Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) (quoting First Nat’l Bank of Ariz. v. Cities of Serv. Co., 391 U.S. 253, 88 S.Ct. 1575, 20 L.Ed.2d 569 (1968)).
Lowry points to several purported factual disputes, notably whether the door to Suite 201 was ajar, whether the office within the suite was dark, and whether Sergeant Nulton provided a warning before he released Bak. The district court concluded that these were not genuine issues of fact because Lowry presented no admissible evidence to counter the three officers’ testimony.
The officers testified that the door to the office suite was open. The only evidence offered by Lowry to the contrary was her own testimony, but, as the district court observed, she did not “testify that she actually closed the door, but speculates that it did close because she knew it to be an automatically closing door.” The court rejected that evidence as insufficient, finding that “she fail[ed] to offer admissible firsthand testimony” to contradict the officers’ testimony.
■ The district court also concluded that Lowry’s testimony as to the level of illumination in the suite was “entirely speculative.” She offered no evidence contradicting the officers’ account of the fighting within the interior of Suite 201 on the night of the incident. Indeed, Lowry testified in her deposition that it was “dark” in the suite when she went to sleep, and that there were no fights or computer screens illuminating the room.
As for whether the officers gave a verbal warning that the police dog would be deployed, all three officers testified to that effect. In response, Lowry testified that she did not hear such a warning. The district court concluded that Lowry’s testi *1256 mony to that effect did not create a genuine dispute as to whether a warning had in fact been given. The district court observed that she “lack[ed] proper foundation to testify to this fact because she was sleeping at the time” the warning was given. She was not, as a result, in a position to know whether a warning had been given.
“Evidentiary rulings made in the context of summary judgment motions are reviewed for abuse of discretion and ‘can only be reversed if ... both manifestly erroneous and prejudicial.’ ” Bias v. Moynihan, 508 F.3d 1212, 1224 (9th Cir. 2007) (internal quotation marks omitted) (quoting Bailen v. City of Redmond, 466 F.3d 736, 745 (9th Cir. 2006)). “Generally, a witness must have ‘personal knowledge of the matter’ to which she testifies.” Bemis v. Edwards, 45 F.3d 1369, 1373 (9th Cir. 1995) (quoting Fed. R. Evid. 602). It was not manifestly erroneous for the district court to conclude that Lowry lacked personal knowledge of events that she did not in fact witness or was not in a position to perceive on the night in question. We uphold the district court’s conclusion that there was not a genuine dispute as to whether the door was open, the suite was dark, and the warnings had been given.

B. Reasonableness of the Force Used

Because there are no genuine issues of material fact and “the relevant set of facts” has been determined, the reasonableness of the use of force is “a pure question of law.” Scott, 550 U.S. at 381 n.8, 127 S.Ct. 1769.[5]
Although Lowry has not sued the individual police officers, her Monell claim against the City first requires her to establish that the force used against her was unconstitutionally excessive. In assessing the objective reasonableness of a particular use of force, we consider: (1) “the severity of the intrusion on the individual’s Fourth Amendment rights by evaluating the type and amount of force inflicted,” (2) “the government’s interest in the use of force,” and (3) the balance between “the gravity of the intrusion on the individual” and “the government’s need for that intrusion.” Glenn v. Washington County, 673 F.3d 864, 871 (9th Cir. 2011) (internal quotation marks and citations omitted).
This inquiry must be viewed “from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight.” Graham, 490 U.S. at 396, 109 S.Ct. 1865. An officer’s use of force cannot be deemed excessive based on facts that he reasonably would not have known or anticipated.
1. The Type and Amount of Force
The first step of the excessive force inquiry requires us to “assess the severity of the intrusion on the individual’s Fourth Amendment rights by evaluating ‘the type and amount of force inflicted.’ ” Espinosa v. City & County of S.F., 598 F.3d 528, 537 (9th Cir. 2010) (quoting Miller v. Clark County, 340 F.3d 959, 964 (9th Cir. 2003)). We must undertake a case-by-case analysis. See Torres, 648 F.3d at 1124 (holding that an excessive force inquiry is a “highly fact-intensive task for which there are no per se rules”).
Our precedent establishes that characterizing the quantum of force with regard to the use of a police dog depends on the specific factual circumstances. In Smith v. City of Hemet, 394 F.3d 689, 701-02 (9th *1257 Cir. 2005) (en banc), we held that the use of a police dog constituted excessive force where the officers sicced the dog on the plaintiff three times, including once after he had already been pinned down, and then pepper sprayed his open wounds. Similarly, in Chew, we concluded that “the force used to arrest [the plaintiff] was severe” because the dog bit the plaintiff three times, dragged him between four and ten feet, and “nearly severed” his arm. 27 F.3d at 1441. On the other hand, in Miller v. Clark Comity, we held that the use of force, although considerable and serious, was nonetheless reasonable and did not rise to the level of “deadly force,” even though the dog apprehended a fleeing suspect with a bite that lasted between forty-five and sixty seconds, “shredded” the plaintiffs muscles, and reached the bone. 340 F.3d at 961-66.
Here, the district court properly concluded that the use of force was “moderate.” Unlike in Chew, 27 F.3d at 1441, where the police dog was “beyond the reach of a countermanding order” when the dog found the plaintiff, dragged him up to ten feet, and “nearly severed” his arm, in this case, Sergeant Nulton closely followed Bak and called her off very quickly after the initial contact with Lowry. In part because of Nulton’s close proximity to Bak, the encounter between Lowry and Bak was so brief that Nulton did not even know if contact had occurred. Thus, the risk of harm posed by this particular use of force, and the actual harm caused, was moderate. The district court properly determined that the use of force in this instance was not severe.
2. The City’s Interest in the Use of Force
The second step of the excessive force analysis under the Fourth Amendment is to “evaluate the government’s interest in the use of force.” Glenn, 673 F.3d at 871. That interest is assessed by considering three primary factors: “(1) the severity of the crime at issue, (2) whether the suspect posed an immediate threat to the safety of the officers or others, and (3) whether the suspect was actively resisting arrest or attempting to evade arrest by flight.” Miller, 340 F.3d at 964. These factors, set forth in Graham v. Connor, 490 U.S. 386, 396, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989), are not exclusive, however, and we examine the totality of the circumstances, considering other factors when appropriate. Glenn, 673 F.3d at 872.
The first Graham factor, the severity of the crime at issue, weighs in the City’s favor. Because the building’s burglar alarm had been triggered late at night, the door to the office suite had been left ajar,[6] and no one responded to Sergeant Nulton’s warnings, the officers reasonably concluded that a burglary might be in progress.[7] “[B]urglary and. attempted *1258 burglary are considered to carry an inherent risk of violence.” Sandoval v. Las Vegas Metro. Police Dep’t, 756 F.3d 1154, 1163 (9th Cir. 2014). The Supreme Court has stated that “[b]urglary is dangerous because it can end in confrontation leading to violence.” Sykes v. United States, 564 U.S. 1, 9, 131 S.Ct. 2267, 180 L.Ed.2d 60 (2011), overruled on other grounds by Johnson v. United States, — U.S. -, 135 S.Ct. 2551, 192 L.Ed.2d 569 (2015). Thus, the seriousness of the suspected crime weighs in favor of the City.
The second Graham factor, “whether the suspect pose[d] an immediate threat to the safety of the officers or others,” is “the most important single element of the three specified factors.” Chew, 27 F.3d at 1441. When viewing the facts from the perspective of the officers, it is apparent that a reasonable officer could have concluded that if there was someone committing a burglary in the building, that person might be armed and could pose an immediate threat to the safety of the officers. The officers knew that they had been dispatched to respond to a burglar alarm, that they arrived quickly to find a dark commercial building and an open door, and that no one responded to their warnings. In Miller, we concluded that the officer was entitled to assume that the suspect posed an immediate threat because he was hiding, the officer did not know whether he was armed, and he had ignored the officer’s warning that a police dog would be released. 340 F.3d at 965. Similarly “objectively menacing circumstances” existed here. See id.
Moreover, when confronted with signs of a burglary, investigating officers are entitled to protect their own safety. See Sandoval, 756 F.3d at 1163. We have previously observed that “when officers suspect a burglary in progress, they have no idea who might be inside and may reasonably assume that the suspects will, if confronted, flee or offer armed resistance.” Frunz v. City of Tacoma, 468 F.3d 1141, 1145 (9th Cir. 2006). Thus, “[s]o long as the officers have established probable cause for a burglary, ‘in such exigent circumstances, the police are entitled to enter immediately using all appropriate force.’ ” Sandoval, 756 F.3d at 1163 (quoting Frunz, 468 F.3d at 1145; alterations incorporated). This factor weighs in favor of the City in this case.
The third factor, whether Lowry was resisting or attempting to evade arrest, does not weigh substantially either way here. That factor can be important when an officer is facing a suspect and can observe whether that suspect is complying or resisting. In this case, though, nobody responded to the warnings shouted by Sergeant Nulton, so the officers did not know anything specific about whomever might have been inside the building. The district court concluded that because Lowry did not respond to Nulton’s commands, “the officers could [have] reasonably believe[d] that the suspect was ignoring their commands, thereby evading arrest.” Although we have acknowledged that “[e]ven purely passive resistance can support the use of some force,” we have explained that “the level of force an individual’s resistance will support is dependent on the factual circumstances underlying that resistance.” Bryan v. MacPherson, 630 F.3d 805, 830 (9th Cir. 2010). Our cases suggest that where the suspect passively resists arrest, a lesser degree of force is justified compared to situations in which the suspect actively resists arrest. See. e.g., Glenn, 673 F.3d at 875; Smith, 394 F.3d at 703. In the *1259 end, this factor does not weigh either way in this case.
In assessing the City’s interest in the use of force, other relevant factors we have identified include “whether proper warnings were given” and “the availability of less intrusive alternatives to the force employed.” Glenn, 673 F.3d at 872.
We have held that an important consideration in evaluating the City’s interest in the use of force is “whether officers gave a warning before employing the force.” Id. at- 876; see also Nelson v. City of Davis, 685 F.3d 867, 882 (9th Cir. 2012). All three officers testified that Sergeant Nulton issued a warning and repeated it before entering the suite with Bak. Although Lowry did not hear the warnings, the officers did not know and had no reason to know that someone would be in a nonresidential building late at night and sleeping so deeply that she would be unable to hear a warning or to be awakened by the officers’ calls. The circumstances were not at all like those in Nelson, where we held that the officers had failed to give sufficient warning despite their attempts to do so because they were 45 to 150 feet from the group, in a party of 1,000 people, and it was “undisputed that they lacked any means with which to amplify their voices so that they could be heard over the din of the crowd.” 685 F.3d at 882. Here, the officers’ issuance of warnings outside the door of the suite weighs in favor of the City.
We also consider “whether there were less intrusive means of force that might have been used before officers resorted” to releasing Bak. Glenn, 673 F.3d at 876. In assessing alternatives, however, we must not forget that “officers ‘are not required to use the least intrusive degree of force possible.’ ” Nelson, 685 F.3d at 882 (quoting Forrester v. City of San Diego, 25 F.3d 804, 807 (9th Cir. 1994)). As Graham cautioned, courts must allow “for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation.” 490 U.S. at 397, 109 S.Ct. 1865.[8]
The practice of allowing dogs to inspect areas off-lead is in place to protect officers’ safety. Lowry suggests that the police dog could have been kept on her leash, albeit without any evidence in support of the effectiveness of that alternative technique.[9] If that approach had been fol *1260 lowed, Sergeant Nulton would have been required to expose himself to what the officers reasonably suspected was a burglar, lurking in the dark office, possibly armed. See Miller, 340 F.3d at 968 (concluding that the use of an off-leash police dog was reasonable and rejecting the alternative proposal of keeping the dog on-leash, because it could have led the officer into an ambush or pulled him “into a dangerous situation with no opportunity to react safely”). The conceivable alternatives to SDPD’s policy do not weigh against the City’s interest in the use of force under these particular circumstances.
3. The Balance of Interests
The final step of the excessive force inquiry requires us to balance the gravity of the intrusion on Lowry’s Fourth Amendment rights against the City’s need for that intrusion. Glenn, 673 F.3d at 871. Here, the force used was not severe, and the officers had a compelling interest in protecting themselves against foreseeable danger in an uncertain situation, which they reasonably suspected to be an ongoing burglary. We conclude that the use of Bak under these circumstances did not violate Lowry’s rights under the Fourth Amendment.

C. The City’s “Bite and Hold” Policy

' Because we conclude that Lowry did not suffer a constitutional injury, she cannot establish liability on the part of the City. See City of Los Angeles v. Heller, 475 U.S. 796, 799, 106 S.Ct. 1571, 89 L.Ed.2d 806 (1986). As a result, we do not reach the issue of whether the district court properly granted summary judgment on the alternative ground that Lowry failed to satisfy the additional requirements for municipal liability under Monell.
III. Conclusion
We affirm the summary judgment entered by the district court in favor of the City. There were no genuine disputes of material fact regarding Lowry’s claim. From the perspective of a reasonable officer on the scene, the type and amount of force inflicted was moderate, the City had a strong interest in using the force, and the degree of force used was commensurate with the City’s interest in the use of that force. The force 'used was not excessive and did not violate the Fourth Amendment. Because the officers’ actions were constitutional, the City cannot be held liable under Monell.
AFFIRMED.

. Lowry argues that there is a genuine dispute of material fact as to whether the door leading to Suite 201 was in fact open. As will be discussed below, we conclude that the district court did not abuse its discretion in ruling that Lowry had not presented admissible evidence to dispute the officers’ testimony that the door was open when they arrived.

. Lowry contends there is a genuine dispute of material fact regarding whether Sergeant Nulton gave these warnings. As discussed below, we hold that the district court did not abuse its discretion in finding that Lowry had provided no admissible evidence to the contrary.

.Lowry argues that there is a genuine issue of fact regarding whether the office was dark. The district court concluded that Lowry did not submit admissible evidence sufficient to raise a genuine dispute of material fact regarding the degree of illumination inside Suite 201. We hold that the district court did not abuse its discretion, as discussed below.

. These factors are derived from Graham v. Connor, 490 U.S. 386, 396, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989).

. The dissent discusses the question posed by this case in terms of what a jury might decide, but once the facts have been established, this case presents a question of law to be decided by the court.

. The dissent may exaggerate the significance of the door being propped open. Even if it had been closed, it could be argued that it might not have been unreasonable for officers responding to a burglar alarm at a dark commercial building late at night to check doorknobs to see whether they were locked. The door in question was obviously unlocked, if it was not open, because the officers entered the office on their own. Because the admitted evidence supported the finding that the door was open, though, we need not decide whether that finding or any other factual finding made in this case by the district court was essential to the summary judgment in this case. Each set of circumstances must be evaluated on a case-by-case basis.

. The dissent argues that a reasonable officer would have considered the possibility that the burglar alarm was a false alarm, and therefore would not have concluded that a burglary was in progress. Although the burglar alarm was the reason the police arrived on the scene, once the officers approached the building, they made other observations, such *1258 as the open door, suggesting a burglary was in progress.

. The dissent relies upon the possibility that the alarm might have been false. Many alarms are false, and likely the officers knew that was a possibility here. The chance the alarm was false did not give the officers reason simply to disregard it, however. They had been dispatched to investigate this alarm. We reasonably expect police officers to respond to alarms, not to ignore them because they might be false.
The real question was whether the officers proceeded unreasonably in their inspection of the building because of the possibility that the alarm was false. The answer to that question was no. If the alarm had gone off by itself and there was nobody in the building, then there would have been nobody at risk of harm. The only alternative that weighed against releasing Bak was the possibility that there was an innocent person in the building. That turned out to be the case, but that could not have seemed like a likely possibility to the officers at the time. They were at a dark commercial building, late at night, where an alarm had been sounded, and a door was found open. The officers called more than one warning in a loud voice at close range with no response. It was not unreasonable for the officers to infer that the risk of harm to an innocent bystander was small.

. In one sentence in her motion opposing summary judgment and on appeal, Lowry presented the “guard and bark” technique as an alternative policy the SDPD should have employed. This was not further developed before the district court.