FILED

NOT FOR PUBLICATION

FEB 06 2018

UNITED STATES COURT OF APPEALS

MOLLY C. DWYER, CLERK
U.S. COURT OF APPEALS

FOR THE NINTH CIRCUIT



| | |
|---|---|
| J. A. L., a minor, by and through his Guardian Ad Litem, Laurie Valdez, <br><br>      Plaintiff-Appellant, <br><br> v. <br><br> MIKE SANTOS, individually and as a Police Officer of SJSU and FRIT VAN DER HOEK, individually and as a Police Officer of SJSU, <br><br>      Defendants-Appellees. | No. 16-15629 <br><br> D.C. No. 5:15-cv-00355-LHK <br><br> MEMORANDUM* |

Appeal from the United States District Court
for the Northern District of California
Lucy H. Koh, District Judge, Presiding

Argued and Submitted November 14, 2017
San Francisco, California

Before: CLIFTON and FRIEDLAND, Circuit Judges, and SESSIONS,** District Judge.

---

     \*      This disposition is not appropriate for publication and is not precedent except as provided by Ninth Circuit Rule 36-3.

     \*\*      The Honorable William K. Sessions III, United States District Judge for the District of Vermont, sitting by designation.

The district court granted summary judgment in favor of San Jose State University Police Officers Michael Santos and Frits Van der Hoek on J.L.'s claims that, when the officers fatally shot his father Antonio Lopez in 2014, they violated Lopez's Fourth Amendment rights and were also negligent under California law. We affirm.

The officers did not violate Lopez's Fourth Amendment rights. On a motion for summary judgment, "facts must be viewed in the light most favorable to the nonmoving party," but where the record includes a video, a court "should . . . view[] the facts in the light depicted by the videotape." *Scott v. Harris*, 550 U.S. 372, 380–81 (2007). Van der Hoek's body camera captured the tragic minute-long series of events that resulted in Lopez's death. Santos repeatedly ordered Lopez to get on the ground and to drop his weapon. Lopez initially complied, but soon stood up with a large blade in his hand and moved toward Santos and Van der Hoek, defying Santos's commands. Van der Hoek moved closer to Lopez without impeding his progress, and yelled, "Taser! Taser! Taser!" Lopez did not respond to the warning, and when Van der Hoek fired his taser it did not appear to have any effect. Lopez immediately began to run, quickly turned in Van der Hoek's direction, and headed directly toward him, still holding the blade.

2

In response, Santos fired two shots from his position behind Lopez. Lopez's resulting injuries proved fatal.

Santos and Van der Hoek are public officials and are therefore "immune from suit under 42 U.S.C. § 1983 unless they have violated a statutory or constitutional right that was clearly established at the time of the challenged conduct." *City & Cty. of S.F. v. Sheehan*, 135 S. Ct. 1765, 1774 (2015) (internal quotation marks omitted). An officer may use deadly force where "the officer has probable cause to believe that the suspect poses a significant threat of death or serious physical injury to the officer or others." *Tennessee v. Garner*, 471 U.S. 1, 3 (1985). Moreover, an officer's "particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Graham v. Connor*, 490 U.S. 386, 396–97 (1989); *see also Smith v. City of Hemet*, 394 F.3d 689, 704 (9th Cir. 2005) (en banc) ("Thus, where a suspect threatens an officer with a weapon such as a gun or a knife, the officer is justified in using deadly force.").

J.L. argues that Lopez was attempting to flee the scene, but this is contradicted by the video. *See Scott*, 550 U.S. at 380. J.L.'s additional arguments are equally unavailing. First, J.L. argues that the officers should have warned Lopez prior to using lethal force, but such a warning is required only "whenever

3

practicable." *Harris v. Roderick*, 126 F.3d 1189, 1201 (9th Cir. 1997) (citing *Garner*, 471 U.S. at 11–12). Second, J.L. contends that Santos could have used nonlethal force, but "officers are not required to use the least intrusive degree of force possible." *Lowry v. City of San Diego*, 858 F.3d 1248, 1259 (9th Cir. 2017) (en banc) (internal quotation marks omitted). Finally, J.L. asserts that the officers should have approached the situation differently because of Lopez's alleged mental health issues, but these concerns were not "knowable to the defendant officers" at the time. *See White v. Pauly*, 137 S. Ct. 548, 550 (2017).

Nor was the officers' conduct negligent under state law. California "negligence law . . . is broader than federal Fourth Amendment law." *Hayes v. Cty. of San Diego*, 305 P.3d 252, 263 (Cal. 2013). "In other words, preshooting circumstances might show that an otherwise reasonable use of deadly force was in fact unreasonable." *Id.* at 256.

Central to J.L.'s negligence argument is his belief that the officers were aware that Lopez was experiencing some kind of emotional disturbance and that their response disregarded relevant training. Likewise, the expert testimony about the officers' preshooting conduct is premised on unsupported claims that the officers knew Lopez had mental health issues. The record shows a call to university police about Lopez waving or stabbing a knife in the air as he walked

4

down the street; Lopez was talking to himself during his encounter with Santos and Van der Hoek; and Officer Van der Hoek noticed that Lopez was acting strange and stated that "there was something just wrong with him." Neither Santos nor Van der Hoek had any additional information about Lopez's mental health prior to the one-minute encounter.

Even if the officers knew Lopez was likely impaired, they were faced with a man carrying a large blade in a populated area who repeatedly refused to comply with their commands. California law does not require officers to "choose the most reasonable action or the conduct that is least likely to cause harm" and "[l]aw enforcement personnel have a degree of discretion as to how they choose to address a particular situation." *Id.* at 258 (internal quotation marks omitted). In lethal force cases, the California Supreme Court has specifically warned against "divid[ing a] plaintiff's cause of action artificially into a series of decisional moments," and instructs courts to consider the reasonableness of officers' preshooting conduct "as part of the totality of the circumstances." *Id.* at 261–62 (emphasis omitted).

Here, when the officers attempted to use non-lethal force, Lopez responded by running toward Van der Hoek with a blade, immediately creating a life-threatening situation. Considering "the totality of the circumstances," and viewing

5

the facts in the light most favorable to J.L., a reasonable juror could not find that the officers were negligent. *See id.* at 258.

**AFFIRMED.**

*J.A.L. v. Santos, et al.*, 16-15629

FRIEDLAND, J., concurring in part and dissenting in part:

Under federal law, "even if an officer negligently provokes a violent response, that negligent act will not transform an otherwise reasonable subsequent use of force into a Fourth Amendment violation." *Billington v. Smith*, 292 F.3d 1177, 1190 (9th Cir. 2002) (emphasis omitted), *abrogated on other grounds by Cty. of Los Angeles v. Mendez*, 137 S. Ct. 1539 (2017). I agree that video evidence makes clear that Antonio Lopez ran directly at Officer Frits Van der Hoek while holding a saw-like blade. It is beyond dispute that, at that moment, Sergeant Michael Santos had probable cause to believe Lopez posed "a significant threat of death or serious physical injury to" Officer Van der Hoek, *Tennessee v. Garner*, 471 U.S. 1, 3 (1985). I therefore agree that the district court properly granted summary judgment in favor of the officers on J.L.'s Fourth Amendment claim.

But California law is different, and in my view that difference should have precluded summary judgment on J.L.'s negligence claim. Under California law, unlike under federal law, what officers do before shooting can "show that an otherwise reasonable use of deadly force was in fact unreasonable." *Hayes v. Cty. of San Diego*, 305 P.3d 252, 256 (Cal. 2013). This means that "tactical conduct and decisions preceding the use of deadly force" may "give[] rise to negligence liability" if they "show, as part of the totality of circumstances, that the use of

1

deadly force was unreasonable." *Id.* at 263. Construing the record in the light most favorable to J.L., a reasonable jury could find that the officers precipitated the need for deadly force, and that the officers' use of deadly force was unreasonable under California law as a result. J.L.'s negligence claim should therefore have made it to trial.

The officers had ample reason to suspect that Lopez was mentally impaired. Police dispatch reported a man either "waving [a knife] *in the air* or stabbing it *in the air*." Sergeant Santos was first on scene and described Lopez as "looking at me, but not really looking at me," kind of like he was looking "[p]ast me." When Sergeant Santos ordered Lopez to get on the ground, Lopez began muttering under his breath but still "did not appear to be acknowledging that [anyone] was there." Lopez eventually kneeled, but then stood up, pulled the saw-like blade out from his sweatshirt pocket and, as Sergeant Santos testified, "just held it." Because the blade had no handle, Lopez clutched the serrated edge in his bare hand. When asked in his deposition whether he was "concerned that [Lopez] was mentally disturbed," Sergeant Santos answered "Yes."

Officer Van der Hoek arrived soon after Sergeant Santos and noted that Lopez "was acting weird the whole way" as he approached Lopez from behind. And when Officer Van der Hoek came around and saw Lopez's face, it was as if Lopez "was not looking at [the officers]." "He was staring off." Put simply, as

Officer Van der Hoek testified, "it was really obvious" that there was something "just wrong" with Lopez.

As J.L.'s expert on law enforcement tactics explained, officers dealing with someone who is mentally impaired—as both officers thought was true of Lopez—are trained that "threats may create additional fright, stress, or potential aggression." They are also trained to, among other things, "take time to assess the situation." But here a reasonable jury could find that the officers escalated the situation despite being trained to calm it down. The first thing Sergeant Santos did upon arriving on scene was draw his gun, and the next thing he did was order Lopez to get on the ground and show his hands. Officer Van der Hoek arrived moments later, circled in front Lopez, and drew his taser. Lopez was walking slowly forward, muttering under his breath, looking at the ground. Officer Van der Hoek shouted "Taser! Taser! Taser!" and deployed his taser, prompting Lopez to charge him.[1] Lopez was shot dead moments later. Officer Van der Hoek had been on scene for less than a minute, and Sergeant Santos not much longer than that.

None of this is to say that the officers lack strong arguments. My colleagues offer several. But our task, as was the district court's, is only "to determine whether there is a genuine issue for trial," *Anderson v. Liberty Lobby, Inc.*, 477

---

[1] My colleagues take "Taser! Taser! Taser!" as a warning to Lopez, but it could just as easily have been a communication to Sergeant Santos. Because this case comes to us on summary judgment, we must assume the latter.

U.S. 242, 249 (1986).  Juries, not courts, "weigh the evidence and determine the truth."  *Id.*  In this case, a jury should determine whether more restraint could have avoided the need for deadly force—and whether California law required more restraint under the circumstances.