*Notice: This opinion is subject to formal revision before publication in the Atlantic and Maryland Reporters. Users are requested to notify the Clerk of the Court of any formal errors so that corrections may be made before the bound volumes go to press.*

# DISTRICT OF COLUMBIA COURT OF APPEALS

No. 19-CV-912

JORDAN MARCUS THURMAN, APPELLANT,

v.

DISTRICT OF COLUMBIA, *et al*., APPELLEES.

Appeal from the Superior Court
of the District of Columbia
(CAB-3993-17)

(Hon. Michael L. Rankin, Trial Judge)

(Argued February 25, 2021                    Decided September 15, 2022)

*Neil E. Nappo* for appellant.

*Lucy E. Pittman*, Assistant Attorney General, with whom *Karl A. Racine*, Attorney General, *Loren L. AliKhan*, Solicitor General at the time of argument, and *Caroline S. Van Zile*, Principal Deputy Solicitor General at the time of argument, were on the brief, for appellee.

Before EASTERLY and DEAHL, *Associate Judges*, and WASHINGTON, *Senior Judge*.

WASHINGTON, *Senior Judge*:  Appellant, Jordan Thurman, was fifteen years old when he was bitten by a Metropolitan Police Department ("MPD") canine while hiding from MPD officers in his great-grandmother's house.  A neighbor called the police when Mr. Thurman and his friends entered his great-

grandmother's house through a window. As a result of the dog bites, Mr. Thurman filed a five-count complaint against the District of Columbia and MPD Officers Craig Reynolds and Daniel Jones, alleging one count of negligence, one count of personal injuries, one count of excessive force, one count of violation of civil rights, and one count of assault and battery. On September 10, 2019, the trial court granted summary judgment in favor of the officers and the District on all five counts. Mr. Thurman is appealing the grant of summary judgment in favor of the District and the officers on his excessive force, civil rights, and negligence claims.[1]

After careful review, we conclude that the trial court erred in granting summary judgment in favor of the officers on Mr. Thurman's claim of negligence. Accordingly, we reverse the court's grant of summary judgment in favor of the officers and remand on the negligence claim. We affirm the grants of summary judgment for the District and the officers on the excessive force and violation of civil rights claims and for the District on the negligence claim.

---

[1] Mr. Thurman does not challenge the grant of summary judgment on his assault and battery or personal injury claims, so we do not review the rulings on those claims. *See Jane W. v. President & Dirs. of Georgetown Coll.*, 863 A.2d 821, 823 n.2 (D.C. 2004).

## I.    Background

On June 13, 2014, Mr. Thurman's school would not let him in the building because he was tardy, so he and two friends decided to go to his great-grandmother's house at 5131 Chillum Place NE.  He did not have a key to the house, but one of his friends told a gardener in a neighbor's yard that Mr. Thurman was the grandson of the homeowner.  The smallest of Mr. Thurman's friends entered the house through a window and let Mr. Thurman and the other friend in through the door.  The gardener saw the boys enter through the window and asked a neighbor to call 9-1-1.  The neighbor called 9-1-1 and told the operator that "three little boys" entered 5131 Chillum Place NE.

The occupant of the house, Clarence Winkler, was not at home when the juveniles broke in, but the police called him to inform him about the break-in.[2] Mr. Winkler called his friend, Sergeant Brandon Green, an MPD officer, to let him know he had three firearms in the house in two safes.  Mr. Winkler explained that he passed along this information because he wanted the officers to be "aware that there was a weapon in the house," adding, "I don't know who broke in the house,

---

[2] Mr. Thurman's great-grandmother no longer lived in her home, but his Uncle, Mr. Winkler, was living there at the time.

so I don't know if they could've broken in the safe [and] took the gun . . . ." Sergeant Green was not on duty, but he told Mr. Winkler that he would pass along the information to the officer then in charge at the precinct.

Officer Reynolds and Officer Jones were called to what was referred to as a burglary in process at 5131 Chillum Place NE. Officer Reynolds and Officer Jones were with the MPD Canine Unit. When the dispatcher stated that juveniles were involved, Officer Reynolds and Officer Jones were going to disregard the call because, under an MPD General Order, the canine unit does not respond to calls when the suspects are juveniles. However, the officers decided to respond to the call when it was reported that weapons were in the house. Officer Reynolds stated in his deposition that the presence of weapons "changes everything." At one point Officer Cynthia Williams, who was already on the scene, could be heard on the 4th District radio channel saying, "The complainant that called is out here with me . . . he saw them go in . . . apparently one of them may be the grandson but he claims he didn't have a key . . . ." Neither Officer Reynolds nor Officer Jones remember hearing Officer Williams's transmission.

Officer Jones and Officer Reynolds arrived at 5131 Chillum Place NE about thirty minutes after getting the initial call. When they arrived, they learned that the

suspects were still in the house. Sergeant Michelle Starr, Officer Williams, and multiple other officers had arrived before Officer Reynolds and Officer Jones and had surrounded the house. At that point, Mr. Winkler arrived and confirmed that no one was supposed to be in the house.

Officer Jones talked to Mr. Winkler when he arrived, and Mr. Winkler told him there were guns inside the house. Officer Jones stated that he did not ask him what type of guns were in the home. Mr. Winkler maintains that he did tell Officer Jones the locations of the guns, but Officer Jones did not recall that Mr. Winkler told him the guns were in safes. Officer Reynolds did not talk to any officers or neighbors on the scene other than Sergeant Starr. He did not know the ages of the juveniles inside the house. Sergeant Starr stated in her deposition that she did not talk to any civilians on the scene prior to deploying the canines. She did not obtain any descriptions of the suspects or their behavior. Meanwhile, Mr. Thurman and his friends saw the police through the window and ran upstairs. Mr. Thurman proceeded to hide under a blanket when he heard the police come inside.

Sergeant Starr, Officer Jones, and Officer Reynolds decided to use Max, a police canine, to search for the suspects because of the presence of guns in the house. "For tactical reasons and for officer safety," Sergeant Starr approved the

omission of a canine warning when the officers entered the home with Max. The MPD General Order on Canine Teams states that "[p]rior to *all* canine deployments (both tactical and non-tactical), the handler shall . . . [i]ssue a loud and clear announcement." However, the Order allows for exceptions to the warning requirement in "exigent circumstances where specific articulated facts demonstrate the need for complete surprise or where the announcement may place the handler in imminent danger," and "the on-scene supervisor must approve the omission." The Order prohibits the use of canines to apprehend juvenile suspects who "pose no immediate threat of serious injury to members on the scene."

Officer Reynolds stated that they determined they would use Max because there were weapons in the house, and the officers' safety was their primary concern. However, the only evidence the officers had of the juveniles potentially being armed were Mr. Winkler's statements that there were weapons inside the house. In his deposition, Officer Jones stated that this was not an exigent or emergency situation, explaining, "There was no rush or [exigent] emergency to go in there immediately without receiving authorization." Sergeant Starr stated that she did not discuss the decision to deploy the canines while omitting the warning with the other Sergeant on the scene, Sergeant Leary.

Mr. Winkler gave the officers a key to the house. Officer Reynolds and Max entered the house, and Officer Jones provided "tactical backup." Officer Reynolds and Officer Jones both maintain that they omitted a canine warning when entering. However, Officer Williams stated that she was sure that she heard an announcement. Mr. Winkler also said that he heard the officers give a warning that they were entering the house.

Officer Reynolds and Max had completed searching a bedroom when Max turned away from Officer Reynolds and reentered the bedroom, moving toward a comforter or blanket on the floor. Max bit the blanket and Mr. Thurman, who was hiding under the blanket. Officer Reynolds said that Mr. Thurman then "popped his head . . . from underneath the comforter." Mr. Thurman said that Max bit him twice on the face, three seconds apart, for a total of about ten seconds. Officer Reynolds said that after the two bites, he grabbed Max to end the hold.

When they came out of the house, Mr. Winkler identified Mr. Thurman as his nephew. Mr. Thurman was charged and convicted of unlawful entry, which was subsequently cleared from his record.

On June 8, 2017, Mr. Thurman filed his five-count complaint against the District, subsequently amending his complaint to add Officer Jones, Officer Reynolds, and Officer Leary as defendants.[3] Three of the five counts are relevant for this appeal.[4] First, Mr. Thurman alleges that the officers used excessive force by utilizing the dog to apprehend him without a warning. Second, Mr. Thurman claims that the officers were negligent because they failed to follow department procedures, failed to adequately investigate the situation, failed to adequately control the dog, and improperly released the dog on him and that, therefore, the District should be held liable for negligent hiring and training and for its policy of allowing omission of a warning prior to unleashing a canine. Finally, Mr. Thurman contends that his civil rights were violated.

The District moved for summary judgment, which Mr. Thurman opposed. As part of Mr. Thurman's opposition to the motion for summary judgment, he included an expert affidavit from Mr. Gerard Busnuk, a retired police officer from the Baltimore Police Department with over twenty-nine years of law enforcement experience. Mr. Busnuk did not purport to have any special knowledge of canine

---

[3] After discovery, Mr. Thurman dismissed his claims against Officer Leary with prejudice.

[4] See *supra* note 1 and accompanying text.

units. Mr. Busnuk's affidavit addressed "solely the issue of negligence on MPD employees' part." He stated that his affidavit was "made with reference to standards of reasonable police conduct, most specifically the District of Columbia's own General Order for Canine Teams, and on [his] own knowledge and experience in this field." Mr. Busnuk opined that Officer Reynolds and Officer Jones breached the standard of care and that their actions or inactions constituted negligence. He explained that "*[e]very reasonable officer*, weighing the evidence of juvenile presence, the likelihood of this being a truancy event, and the fact that the guns were in a locked safe would have, at the very least, given the warning that police canine units are entering the premises and anyone inside should surrender."

The District also provided an expert affidavit. The District's expert, Officer Carlos Rolon, has been a City of Alexandria Virginia police officer for over twenty years and has handled three patrol dogs. Officer Rolon has attended and instructed at several canine seminars and trained several different police dogs for agencies in Virginia, Maryland, the District of Columbia, and West Virginia. Throughout his affidavit, Officer Rolon stated that neither the District nor the officers violated the national standards of care. Officer Rolon described the "national standard," which he drew from the International Association of Chiefs of Police Training Key, as

advising "canine handlers [to] exercise extra care when deployment is being considered in the case of a juvenile subject." He went on to explain that the MPD's juvenile canine policy, which prohibits the use of canines to apprehend juvenile suspects who "pose no immediate threat of serious injury to members on the scene," comported with that national standard. He also stated that the portion of the MPD General Order Canine Teams that "[r]equir[es] a canine team to obtain authorization before deploying a canine exceeds the national standard of care" because most departments leave the authority to deploy a canine to the handler and department policy. Officer Rolon added that the MPD's requirement that warning announcements be omitted only in exigent circumstances or when an officer's safety is compromised is "[c]onsistent with national standards."

On September 10, 2019, the trial court granted summary judgment in favor of the officers and the District. The court found that Mr. Thurman did not establish the applicable standard of care for negligence nor for negligent hiring, training, or supervision. Even if Mr. Thurman had established the applicable standards of care, the court found, the negligence claim against the District would be barred by sovereign immunity. The court also found that the officers were entitled to qualified immunity on the excessive force and violation of civil rights claims because "[t]here is no national consensus and no consensus in this jurisdiction

[regarding] whether the omission of a canine warning violates the Constitution." Finally, the court found that the District was not municipally liable because Mr. Thurman's complaint about the lack of canine warning was not based on a District policy, custom, or practice but instead on "the use of force in this particular instance."

While there appeared to be conflicting testimony in the record as to the omission of the warning, the trial court found that there was no dispute. Officer Reynolds and Officer Jones both testified under oath that they omitted a warning, and their testimony only undermined their position that they acted reasonably under the totality of the circumstances. The trial court held that even if there was a dispute about whether the warning was given, it was not material to the outcome. This appeal followed.

## II. Standard of Review

This court reviews a trial court's grant of a motion for summary judgment de novo. *Kotsch v. District of Columbia*, 924 A.2d 1040, 1044 (D.C. 2007). A trial court will grant summary judgment if the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show

that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Wallace v. Eckert, Seamans, Cherin & Mellott, LLC*, 57 A.3d 943, 949 (D.C. 2012) (internal quotation marks omitted) (citing Super. Ct. Civ. R. 56(c)). "Though we view the evidence in the light most favorable to the non-moving party, mere conclusory allegations by the non-moving party are legally insufficient to avoid the entry of summary judgment." *Kotsch*, 924 A.2d at 1045 (citations omitted).

### III.    Analysis

### A.    Negligence Claim Against the Officers

The trial court granted summary judgment in favor of the police officers on Mr. Thurman's negligence claim because it found that Mr. Thurman did not establish an applicable standard of care. Mr. Thurman argues that he sufficiently spelled out the standards of care for both his negligence and negligent hiring claims in his complaint and that his expert set out the applicable standards of care in his affidavit. In order to show negligence, a plaintiff must first show that a defendant owed him a duty of care. *Giordano v. Sherwood*, 968 A.2d 494, 498 n.7 (D.C. 2009). After he demonstrates the existence of a duty, a plaintiff must

establish "the applicable standard of care, a deviation from that standard of care by the defendant, and a causal relationship between that deviation and the plaintiff's injury." *Scales v. District of Columbia*, 973 A.2d 722, 730 (D.C. 2009) (quoting *Evans-Reid v. District of Columbia*, 930 A.2d 930, 937 n.6 (D.C. 2007)).[5]

"A plaintiff must put on expert testimony to establish what that standard of care is if the subject in question is so distinctly related to some science, profession, or occupation as to be beyond the ken of the average layperson." *District of Columbia v. Peters*, 527 A.2d 1269, 1273 (D.C. 1987). "The standard of care is to be found in 'the practices in fact generally followed by other comparable governmental facilities' or some nationally-recognized standard." *See, e.g.*, *Evans-Reid*, 930 A.2d at 936 (quoting *Clark v. District of Columbia*, 708 A.2d 632, 635 (D.C. 1997)). There appears to be no requirement that the expert's proposed standard be the predominant or prevailing standard nationwide, so it would suffice for the expert to "'link his testimony to [a] certification process, current literature, conference[,] or discussion with other knowledgeable professionals,' at a national level." *Cardenas v. Muangman*, 998 A.2d 303, 308 (D.C. 2010) (first alteration in

---

[5] We note that while the doctrine of qualified immunity applies to Mr. Thurman's excessive force and civil rights claims, see discussion *infra* Part III.C., "qualified immunity . . . does not preclude a suit based on common law negligence." *District of Columbia v. Evans*, 644 A.2d 1008, 1019 (D.C. 1994).

original) (emphasis omitted) (quoting *Strickland v. Pinder*, 899 A.2d 770, 774 (D.C. 2006)).

While the affidavit of Mr. Thurman's expert may have fallen short of establishing the appropriate standards of care to survive summary judgment, the record indicates that a national standard of care was established by the District's expert. The District's expert, Officer Rolon, described the "national standard," which he drew from the International Association of Chiefs of Police Training Key, as advising "canine handlers [to] exercise extra care when deployment is being considered in the case of a juvenile subject." He also stated that the MPD's juvenile canine policy, which prohibits the use of canines to apprehend juvenile suspects who "pose no immediate threat of serious injury to members on the scene," comported with that national standard. Additionally, Officer Rolon explained that MPD's exceptions to the warning requirement are "[c]onsistent with national standards." The MPD General Order Canine Teams allows for exceptions to the warning requirement in "exigent circumstances where specific articulated facts demonstrate the need for complete surprise or where the announcement may place the handler in imminent danger."

This court has previously held that "an opponent's experts can be used to defeat summary judgment." *See Townsend v. Donaldson*, 933 A.2d 282, 296 (D.C. 2007); *Miller-McGee v. Washington Hosp. Ctr.*, 920 A.2d 430, 440 (D.C. 2007); *Abbey v. Jackson*, 483 A.2d 330, 333 (D.C. 1984). Based on the standard of care that the District's expert established, a reasonable jury could find a deviation from that standard and a causal relationship between the deviation and injury. Officer Jones and Officer Reynolds arrived at Mr. Thurman's great-grandmother's home about thirty minutes after getting the initial call. When they arrived, the officers failed to gather critical information. At least four other officers were present, but Officer Reynolds and Officer Jones only spoke to Sergeant Starr. Officer Jones did speak to Mr. Winkler about the locations of the guns but did not recall that Mr. Winkler told him his guns were in safes. Officer Reynolds did not know the ages of the juveniles in the house.

Despite the lack of information, Sergeant Starr, Officer Jones, and Officer Reynolds decided to omit a warning and release Max to search for the juveniles. They determined this was necessary for "safety purposes." However, the only evidence the officers had of the juveniles potentially being armed were Mr. Winkler's statements that there were weapons inside the house. Further, Officer

Jones even stated that "[t]here was no rush or [exigent] emergency to go in there immediately without receiving authorization."

A reasonable jury may find a deviation from the standards described by the District's expert and a causal relationship between the deviation and Mr. Thurman's injury. We therefore reverse and remand appellant's negligence claim against the officers.

### B. Negligence Claims Against the District

We need not reach the issue of whether Mr. Thurman established a standard of care for his negligent hiring, training, and supervision claim because Mr. Thurman's negligence claims against the District are barred by sovereign immunity. Mr. Thurman argues that the MPD employee's negligent actions overcome the District of Columbia's sovereign immunity.[6] This jurisdiction uses

---

[6] Mr. Thurman points to several statements in his expert's affidavit in which his expert indicated that the MPD employees' actions are evidence of the District's negligent hiring, training, and supervision as support for overcoming the District of Columbia's sovereign immunity. One of the statements he highlights is the expert's statement: "The 911 operator receiving this call for service — burglary in progress — was told by the caller that 'three little boys' had broken into the residence[, and the] failure to forward this information would have been *prima facie* evidence of negligent training and supervision . . . ." He also highlights the

(continued…)

the "ministerial-discretionary" test to determine whether the District is entitled to sovereign immunity. *Casco Marina Dev., LLC v. D.C. Redevelopment Land Agency*, 834 A.2d 77, 81 (D.C. 2003). "Governmental actors have no immunity from suit based upon their ministerial actions, but they are immune from suit based upon their discretionary actions." *Id.*

> Discretionary acts have . . . been defined as acts that require personal deliberation, decision, and judgment. They generally have a broad public effect and call for a delicate balancing of competing considerations. Where there is room for policy judgment and decision, there is discretion. In contrast, ministerial acts require little or no judgment, and generally constitute mere obedience to orders or performance of a duty in which the [municipal employee] has little or no choice.

*Nealon v. District of Columbia*, 669 A.2d 685, 690 (D.C. 1995) (alteration in original) (internal quotation marks and citations omitted).

The officers' decision to omit the warning was a discretionary action. The General Order Canine Teams allows for the omission of a warning in "exigent circumstances where specific articulated facts demonstrate the need for complete

---

(…continued)
expert's statement that "[i]t was clear that the patrol officers were not knowledgeable of the restrictions put on police canines when juveniles were present," which the expert believed indicates that the District "was negligent in its training and supervision of police sergeants."

surprise or where the announcement may place the handler in imminent danger." In addition, "[t]he on-scene supervisor must approve the omission." Officer Reynolds and Officer Jones obtained Sergeant Starr's permission before omitting the warning. After a discussion between the officers and the sergeant, they determined that this constituted a circumstance that could endanger the officers because of the guns in the house. This was not a ministerial decision in which the officers had no choice but to follow an order or direction. Sovereign immunity therefore protects the District from Mr. Thurman's negligence claims.

### C.    Excessive Force and Civil Rights Claims Against the Officers

With regard to Mr. Thurman's excessive force and violation of civil rights claims, he argues that Officer Jones's and Officer Reynolds's use of a canine without warning was unreasonable and constituted excessive force under the Fourth Amendment, violating his civil rights. "A claim that law-enforcement officers used excessive force to effect a seizure is governed by the Fourth Amendment's reasonableness standard." *Plumhoff v. Rickard*, 572 U.S. 765, 774 (2014) (internal quotation marks omitted). "[T]he reasonableness of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Kotsch*, 924 A.2d at 1047

(alteration in original) (internal quotation marks omitted). This is an objective standard. *Scott v. Harris*, 550 U.S. 372, 381 (2007).

"Determining whether the force used to effect a particular seizure is reasonable under the Fourth Amendment requires a careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake." *Graham v. Connor*, 490 U.S. 386, 396 (1989) (internal quotation marks omitted). "This balancing test is both objective and fact-sensitive; it looks to the totality of the circumstances known to the officer at the time of the challenged conduct . . . ." *Martin v. Malhoyt*, 830 F.2d 237, 261 (D.C. Cir. 1987) (internal quotation marks omitted).

Several facts in the present case are relevant to our reasonableness analysis. Officers Jones and Reynolds were facing who they believed were suspects in an active burglary, though the suspects were known to be juveniles, and their exact ages were unknown to the officers. The officers believed the juvenile suspects had access to weapons, though it is unclear whether the officers were told that the weapons were in safes. It is also unclear whether the officers were told that one of the suspects was a great-grandson of the homeowner. Furthermore, the officers did not perceive an emergency requiring their immediate entry into the home.

This court has found that officers' use of force was either unreasonable or potentially unreasonable in a number of cases where arguably more force was used than in the present case. *See, e.g.*, *Kotsch v. District of Columbia*, 924 A.2d 1040, 1042-43 (D.C. 2007) (holding that a jury could have found the use of force to be unreasonable where officers dragged a suspect out of a restaurant and struck him several times with a nightstick); *District of Columbia v. Jackson*, 810 A.2d 388, 390, 393 (D.C. 2002) (holding that officers' use of force was excessive when they shot at a suspect reaching for a knife until he was dead, pausing between shots). However, we have not had the occasion to consider a canine-involved excessive force case. Mr. Thurman asserts that several Fourth Circuit canine-involved excessive force cases show that the officers' actions in this case were unreasonable. In *Vathekan v. Prince George's County*, the court stated that "Fourth Circuit precedent existing in 1995 clearly established that failure to give a warning before releasing a police dog is objectively unreasonable in an excessive force context." 154 F.3d 173, 179 (4th Cir. 1998). The *Vathekan* court cited *Kopf*, in which it held that "the improper deployment of a police dog that mauls the target constitutes excessive force in violation of the Fourth Amendment." *Id.* (citing *Kopf v. Wing*, 942 F.2d 265, 268 (4th Cir. 1991)).

We decline to compare how the facts of this case measure up against these cases and assume without deciding that the use of force under the circumstances was unreasonable. We nevertheless agree with the trial court that the officers are entitled to qualified immunity from liability for these claims. We are guided by a two-part analysis when considering whether a government officer is entitled to qualified immunity: "The threshold inquiry is whether the plaintiff's allegations, if true, show that the officer's conduct violated a constitutional or statutory right. If so, then a court should decide whether the right that had been violated was clearly established at the time the alleged violation occurred." *Young v. Scales*, 873 A.2d 337, 341-42 (D.C. 2005) (citation omitted). "Clearly established" means that "existing precedent must have placed the statutory or constitutional question beyond debate." *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011). "The rule must be settled law, which means it is dictated by controlling authority or a robust consensus of cases of persuasive authority." *District of Columbia v. Wesby*, 138 S.Ct. 577, 589-90 (2018) (internal quotation marks and citations omitted).

There are no cases in this jurisdiction in which we have held that the omission of a canine warning violates a constitutional right. Further, both parties have cited circuits with opposing views on the matter, reflecting a circuit split. As discussed previously, the Fourth Circuit has established that the omission of a

canine warning is "objectively unreasonable in an excessive force context." *Vathekan*, 154 F.3d at 179. However, other circuits have treated canine cases differently. The District and the trial court have pointed to *Crenshaw v. Lister*, in which the Eleventh Circuit held that the use of a canine to pursue a potentially armed felony suspect was constitutional. 556 F.3d 1283, 1293 (11th Cir. 2009). In *Crenshaw*, a suspect was fleeing the police on foot after abandoning his car. *Id.* at 1285. The police did not warn the suspect that they had a canine. *Id.* The suspect, who was believed to be armed, alerted the officers to his location, and a canine apprehended and bit him multiple times. *Id.* at 1285-86.

Similar to *Crenshaw*, the Seventh Circuit in *Johnson v. Scott* held that the use of a canine, without a verbal warning, in apprehending a potentially armed felony suspect was constitutional. 576 F.3d 658, 661 (7th Cir. 2009). In *Johnson*, the fleeing suspect surrendered to police by putting his hands up, and a police canine bit him multiple times after he put his hands up. *Id.* at 659. In *Lowry v. City of San Diego*, the Ninth Circuit found that the release of a dog into individual offices in an office suite after a burglary alarm went off was constitutional. 858 F.3d 1248, 1253 (9th Cir. 2017). The police did make a general warning while entering the office suite but did not repeat the warning before going into each room with the canine. *Id.* The canine bit a woman who was asleep on the couch in one

of the offices. *Id.* at 1254. The Ninth Circuit analyzes the use of police dogs in an arrest based on the specific factual circumstances of the case. *Id.* at 1257.

The lack of consensus throughout the circuits and lack of precedent in our jurisdiction supports the conclusion that Mr. Thurman's right was not clearly established. It would not be clear to a reasonable officer in this situation that he or she was violating a constitutional right when releasing a police dog, without warning, into a home with potentially armed juvenile suspects. *See Young*, 873 A.2d 342.[7] Because Mr. Thurman failed to demonstrate that his rights were clearly established, we conclude that the trial court did not err in granting summary judgment for the officers on his excessive force and violation of civil rights claims.

---

[7] MPD's General Order Canine Teams also supports a conclusion that Mr. Thurman's right had not been established. The General Order Canine Team prohibits the use of canines to apprehend juvenile suspects who "pose no immediate threat of serious injury to members on the scene." The General Order also states, "The warning announcement may be omitted from a search in those exigent circumstances where specific articulated facts demonstrate the need for complete surprise or where the announcement may place the handler in imminent danger." Reading these sections together, it is not clear that the exceptions for omitting a warning in exigent circumstances and when an officer's safety is threatened do not also apply in situations with juveniles.

**D.     Excessive Force and Civil Rights Claims Against the District**

Mr. Thurman also argues that the District should be held liable for its officers' excessive force and violations of his civil rights because its "own policy of omission of the warning announcement led directly to appellant Thurman's injuries and to violation of his rights." Holding the District liable for those claims would require a conclusion that the officers' use of the canine in this case was unreasonable under the Fourth Amendment reasonableness standard. *See Scales*, 973 A.2d at 728 n.4. However, assuming without deciding, as we did before, that the officers' actions violated Mr. Thurman's constitutional rights, the District could still not be held liable for the officers' actions.

The Supreme Court held in *Monell v. N.Y.C. Dep't of Soc. Servs.* that in order for a municipality to be held liable for the constitutional violations of its officials, it must have "*itself* cause[d] the constitutional violation at issue." *City of Canton v. Harris*, 489 U.S. 378, 385 (1989) (citing *Monell*, 436 U.S. 658, 694-95 (1978)). To that end, an appellant "must present evidence of an official 'custom' or 'policy' of the District of Columbia which led to [the] constitutional violation." *Kotsch*, 924 A.2d at 1046. "[T]he plaintiff must establish that the official policy or custom itself is 'the moving force of the constitutional violation.'" *Carter v.*

*District of Columbia*, 795 F.2d 116, 122 (D.C. Cir. 1986) (quoting *Monell*, 436 U.S. at 694).

Mr. Thurman argues that the MPD's policy of allowing for the omission of warnings gives the officers cover for their failure to investigate and therefore makes the District liable. However, it is not enough that a municipality's facially lawful policy has led to an employee's violation of a plaintiff's rights; to establish *Monell* liability, a plaintiff must demonstrate that such a policy was implemented "with deliberate indifference as to its known or obvious consequences with regard to violations of constitutional rights." *Bd. of Cnty. Comm'rs v. Brown*, 520 U.S. 397, 407 (1997) (internal quotation marks omitted); *see also Gross v. District of Columbia*, 734 A.2d 1077, 1083 (D.C. 1999). Mr. Thurman has not made a showing that it was "known or obvious" that the policy's exception to the warning requirement would lead to violations of constitutional rights such as those he alleges.

Mr. Thurman also argues that the General Order requires the officers to gather enough information prior to deploying a canine without warning, and the officers' failure to do so makes the District liable. The officers followed MPD policy by consulting with their superior, Sergeant Starr, and in considering the

presence of guns in the home before determining that they would omit the warning prior to entry. More importantly, failure to follow a policy does not result in *Monell* liability because *Monell* liability requires that the policy itself causes the constitutional violation. *See Carter*, 795 F.2d at 122. Therefore, the trial court did not err in granting summary judgment to the District on Mr. Thurman's excessive force and violation of civil rights claims.

\* \* \* \*

For the foregoing reasons, we affirm, in part, and reverse and remand, in part, for proceedings consistent with this opinion.

*So ordered*.