**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

LEE ARTHUR RICE II,
    *Plaintiff-Appellant*,

v.

DALE MOREHOUSE; NICK SHAFFER;
JEFFREY A. HILL; MARK
ABERCROMBIE,
    *Defendants-Appellees*.

No. 18-35459

D.C. No.
1:13-cv-00441-
BLW

OPINION

Appeal from the United States District Court
for the District of Idaho
B. Lynn Winmill, Chief District Judge, Presiding

Argued and Submitted November 8, 2019
Portland, Oregon

Filed March 8, 2021

Before:  Ronald Lee Gilman,* Richard A. Paez, and
Johnnie B. Rawlinson, Circuit Judges.

Opinion by Judge Paez

---

*The Honorable Ronald Lee Gilman, United States Circuit Judge for the U.S. Court of Appeals for the Sixth Circuit, sitting by designation.

## SUMMARY[**]

### Civil Rights

The panel reversed the district court's summary judgment in favor of police officers on the basis of qualified immunity, and remanded, in an action brought pursuant 42 U.S.C. § 1983 alleging that defendants used excessive force when they executed a take-down maneuver while holding plaintiff in a "police lead" position; that is, they tripped plaintiff so that he would fall to the ground as they held his arms behind his back.

The panel first rejected defendants' contention that plaintiff's Notice of Appeal failed to comply with the requirements of Federal Rule of Appellate Procedure 3(c) because plaintiff did not specifically indicate that he was appealing from the district court's summary judgment order granting defendants' motion for summary judgment on the take-down. The panel concluded that plaintiff provided sufficient notice to defendants of the intended scope of his appeal and defendants did not suffer prejudice: they had an opportunity to, and actually did, fully brief the issue.

Viewing the facts in the light most favorable to plaintiff, as was required, the panel concluded that a reasonable jury could find that plaintiff engaged in passive resistance and that defendants' take-down of plaintiff involved unconstitutionally excessive force. Furthermore, because the right to be free from "the application of non-trivial force

---

[**] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

for engaging in mere passive resistance" was clearly established before December 2011, defendants were not immune from suit.

## COUNSEL

Craig H. Durham (argued), Ferguson Durham PLLC, Boise, Idaho, for Plaintiff-Appellant.

Erica J. White (argued), Heather H. McCarthy, and Catherine A. Freeman, Deputy Prosecuting Attorneys; Jan M. Bennetts, Ada County Prosecuting Attorney, Boise, Idaho, for Defendants-Appellees Dale Morehouse and Nick Shaffer.

Scott B. Muir (argued), Deputy City Attorney; Boise City Attorney's Office, Boise, Idaho, for Defendants-Appellees Mark Abercrombie and Jeffrey A. Hill.

## OPINION

PAEZ, Circuit Judge:

In the early morning of December 26, 2011, while driving with his family on Interstate 84 near Boise, Idaho, Lee Arthur Rice II was stopped by a state police officer for failing to signal for a full five seconds before changing lanes. Because he believed that there was no basis for the stop, Rice declined to give the officer his driver's license and car registration and repeatedly asked to speak to the officer's supervisor. The officer radioed for support, and over a dozen officers responded. Several officers pulled Rice out of the car. As they led him to the rear of the car, they tripped him

so that he fell to the ground, pinned him down, and handcuffed him. Rice fell on his face and suffered long-term physical injuries and emotional distress as a result of the encounter. He ultimately filed suit against the officers under 42 U.S.C. § 1983 for violating his constitutional rights, including his Fourth Amendment right to be free from unreasonable seizure.

Rice appeals the district court's order granting partial summary judgment on the basis of qualified immunity in favor of the officers who tripped him to the ground. Because genuine disputes of material fact preclude summary judgment, and the applicable law was clearly established at the time of the incident, we reverse.[1]

## I. BACKGROUND

## A. FACTUAL BACKGROUND

The following facts were either undisputed at summary judgment or, if disputed, are recounted in the light most favorable to Rice, the non-moving party.

On December 26, 2011, at about 3:30 a.m., Rice was driving with his wife and her two teenage daughters when Idaho State Police Officer Janet Murakami stopped him.[2]

---

[1] Rice also appeals the district court's pretrial rulings precluding his expert witnesses from testifying at trial on other aspects of his Fourth Amendment excessive force claim. We affirm the district court's evidentiary rulings in a memorandum disposition filed concurrently with this opinion.

[2] Murakami's dash-mounted video camera provides a visual account of all of the events described here. *See* Joint Exhibit 1001 ("Jt Ex. 1001"). Murakami's microphone was turned on around the time she announced that Rice was under arrest. Jt Ex. 1001 at 5:50.

According to Murakami, she initiated the traffic stop because Rice failed to signal for five seconds before changing lanes, Idaho Code § 49-808(1)–(2), and she suspected that Rice was driving under the influence.  Rice pulled over to the right shoulder of the freeway, just over the fog line.**[3]**  Murakami approached the passenger's side of the car and asked for Rice's license, car registration, and proof of insurance.  Rice showed Murakami his license through the window but declined to give Murakami the other documents.  Murakami returned to her car and requested a "Code 3 assist" through her radio.  According to the government's expert at summary judgment, a "Code 3" request is considered the "most urgent" request for backup officers and generally requires that they respond immediately and with lights and sirens running.

While assistance was on the way, Murakami re-approached Rice's car and again asked him for his license, registration, and proof of insurance.  He declined.  Murakami then walked to the driver's side of the car, opened the door, instructed Rice to exit, and announced that Rice was under arrest for "obstruction and delay."  Rice provided his name but insisted "I will not get out of this car."

Murakami returned to her car and made two additional radio calls.  In the second call, she radioed an update**[4]** and

---

**[3]** In later criminal proceedings against Rice, the state court declared the stop unlawful, and the prosecution dismissed all charges against Rice.

**[4]** As she explained at trial, Murakami radioed a "Code 4" update because she "was trying to tell my dispatch – because I could hear all the sirens from everywhere – that I just – I was okay, not to worry about me. I just needed one or two units."  A Code 4 indicated "she was no longer in danger."  But the uncontroverted evidence at trial was that the arriving

stated "just uh waiting for my support units to get here before I extract this uh driver." Moments later, several police officers arrived, including Defendants-Appellees Dale Morehouse and Nick Shaffer. Murakami spoke to the arriving officers and explained:

> MURAKAMI: K he's just not wanting, sir, yeah just one unit's necessary – he's just not wanting to comply with my instructions.
>
> UNNAMED OFFICER: Okay.
>
> MURAKAMI: He's already been told he's under arrest.
>
> UNNAMED OFFICER: Okay.
>
> MURAKAMI: All I wanted was his license, so I'm just going to need somebody to help me get him out of the car.[5]
>
> UNNAMED OFFICER: Okay.

Although the record does not clearly identify which officers Murakami was speaking to, in their declarations in support of summary judgment, Morehouse and Shaffer paraphrased Murakami's comments in describing what they heard.

---

officers, who used different radio frequencies, did not receive that update.

[5] In the dash-cam video, Murakami can be seen walking toward Rice's car, but facing away from it, as she gave this final instruction.

To determine the lawfulness of the officers' conduct throughout the encounter, the district court divided the events that followed into three stages: (1) officers pulling Rice from his car, (2) officers implementing a "take-down" of Rice, and (3) officers holding Rice on the ground in a "scrum"[6] before handcuffing him.  For clarity, we adopt the same three stages here.

### 1.  The Removal

Murakami re-approached Rice's car from the driver's side, with Morehouse directly behind her.  Murakami repeatedly instructed Rice to get out of the car and threatened to break his car window if he did not.  Rice declined and repeatedly asked to speak to Murakami's supervisor, but did roll down his window and unlock the car.  Murakami opened Rice's door, and, together, Murakami and Morehouse pulled him out from the car.  In his declaration offered in opposition to summary judgment, Rice maintains that he did not resist the officers as they pulled him out of the car.

### 2.  The Take-Down

After Murakami and Morehouse pulled Rice from the car, they attempted to hold Rice in a "police lead" position, grabbing his wrist with one hand and triceps with the other.  Morehouse grabbed Rice's right arm, while Murakami grabbed his left.  When Murakami was unable to grip Rice's arm, Shaffer stepped in, took Rice's left arm, and assumed the police lead position.  Rice again maintains that he did not resist the officers.  Nonetheless, as they approached the rear

---

[6] A "scrum" is "[a] chaotic struggle or tussle, *esp.* one involving large numbers of people; a mêlée; a battle."  *See Scrum*, Oxford English Dictionary (3d ed. 2018), https://www.oed.com/view/Entry/173724 (last visited July 15, 2020).

of the car, Shaffer and Morehouse tripped Rice and forcibly threw him to the ground using a "take-down" maneuver. Rice landed face-first on the pavement and suffered extreme pain.

### 3. The Scrum

While Rice lay on the ground, officers repeatedly struck and kneed him, wrenched his arms and shoulders, and twisted his fingers. He repeatedly asked "what are you doing?" and "why are you doing this?" Eventually, the officers handcuffed Rice, picked him up from the pavement, and took him to Murakami's car.

Criminal misdemeanor charges were filed against Rice but were later dismissed after the state court concluded that Murakami lacked reasonable suspicion or probable cause to stop Rice.

### B.  PROCEDURAL HISTORY

In 2013, Rice filed a pro se suit in the District Court for the District of Idaho against the officers involved in the arrest. His primary claims involved violations of his Fourth Amendment right to be free from excessive force and were brought against defendant Officers Murakami, Morehouse, Shaffer, Mark Abercrombie, and Jeffrey Hill. After Rice obtained counsel, defendants filed motions for summary judgment. The district court ruled on the motions in December 2014 and April 2015. The court (1) denied Murakami qualified immunity as to her Code 3 call, but granted her motion in all other respects; (2) denied Morehouse and Shaffer qualified immunity as to their involvement in the scrum, but granted qualified immunity as to the take-down; and (3) denied qualified immunity to the

other officers involved in the scrum, including Abercrombie and Hill.

Defendants appealed the qualified-immunity rulings.  In November 2016, we affirmed except as to Murakami.  We held that she was entitled to qualified immunity for her Code 3 call.  *Rice v. Murakami*, 671 F. App'x 472 (9th Cir. 2016).  As the panel explained, "[t]hough it is true that a person may be held responsible for the natural consequences of her actions, it is far from established that an officer should have reasonably foreseen that other officers responding to a call would use excessive force . . . ."  *Id.* at 473.

The case proceeded to trial against defendants Morehouse, Shaffer, Abercrombie, and Hill for their alleged use of excessive force during the scrum.  Following the presentation of all evidence by Rice, the district court granted judgment as a matter of law under Federal Rule of Civil Procedure 50(a) to all defendants except Abercrombie.  The jury ultimately returned a verdict in favor of Abercrombie.

Rice filed a notice of appeal without counsel.  We subsequently appointed pro bono counsel to represent him on appeal.

## II.  JURISDICTION

As a threshold matter, we address whether Rice's Notice of Appeal complies with the requirements of Federal Rule of Appellate Procedure 3(c) such that we have jurisdiction.  Morehouse and Shaffer argue that it does not because Rice did not specifically indicate that he was appealing from the district court's April 2015 summary judgment order granting their motion for summary judgment on the take-down.  We disagree.

To take an appeal as of right in federal court, a party must file a notice of appeal within the time allowed by Rule 4.[7] Fed. R. App. P. 3(a). The notice must, among other things, "designate the judgment, order, or part thereof being appealed." Fed. R. App. P. 3(c)(1)(B).

Although Rule 3's requirements are jurisdictional, *Torres v. Oakland Scavenger Co.*, 487 U.S. 312, 317 (1988), "the Rule cautions against their formalistic application," *West v. United States*, 853 F.3d 520, 522 (9th Cir. 2017) (citing Fed. R. App. P. 3(c)(4)). When a party's intent to appeal is objectively clear, "there are neither administrative concerns nor fairness concerns that should prevent the appeal from going forward." Fed. R. App. P. 3(c) advisory committee's note to 1993 amendments. Thus, "[w]hen a party seeks to argue the merits of an order that does not appear on the face of the notice of appeal, we consider: (1) whether the intent to appeal a specific judgment can be fairly inferred and (2) whether the appellee was prejudiced by the mistake." *West*, 853 F.3d at 523 (quoting *Le v. Astrue*, 558 F.3d 1019, 1022–23 (9th Cir. 2009)) (internal quotation marks omitted). "In determining whether 'intent' and 'prejudice' are present, we apply a two-part test: first, whether the affected party had notice of the issue on appeal; and, second, whether the affected party had an opportunity to fully brief the issue." *Id.* at 523–24 (quoting *Ahlmeyer v. Nev. Sys. of Higher Educ.*, 555 F.3d 1051, 1055 (9th Cir. 2009)).

---

[7] Under Rule 4, generally "the notice of appeal required by Rule 3 must be filed with the district clerk within 30 days after entry of the judgment or order appealed from." Fed. R. App. P. 4(a)(1)(A). The time is extended for all parties and runs from the entry of an order disposing of any motion under Federal Rules of Civil Procedure 50(b), 52(b), 54, 59, or 60. Fed. R. App. P. 4(a)(4).

Here, we first conclude that Rice provided sufficient notice to defendants of the intended scope of his appeal. Rice's Notice of Appeal states that he is appealing "from the final judgment" without limitation, which thus fairly covers portions of the judgment not specifically mentioned. *See id.* at 523.[8]  In addition, Rice's take-down was a central issue in the district court and in Rice's opening brief here—factors demonstrating Rice's intent to appeal the summary-judgment order. *See One Indus., LLC v. Jim O'Neal Distrib., Inc.*, 578 F.3d 1154, 1159 (9th Cir. 2009).  Thus, based on the broad language of Rice's Notice of Appeal, as well as the centrality of the issue in the district court and on appeal, we conclude that Rice's intent to appeal the order granting partial summary judgment was clear.[9]

---

[8] Although not at issue here, we note that the order granting partial summary judgment in favor of Morehouse and Shaffer became final and appealable once it merged with the final judgment entered after trial. *See Am. Ironworks & Erectors, Inc. v. N. Am. Const. Corp.*, 248 F.3d 892, 897 (9th Cir. 2001) ("A necessary corollary to the final judgment rule is that a party may appeal interlocutory orders after entry of final judgment because those orders merge into that final judgment.").

[9] Morehouse and Shaffer nonetheless argue that Rice's "Appendix" of the "Issues Raised on Appeal" should limit how we construe the Notice.  This argument fails for several reasons.  Most importantly, Rice's list of issues was not an appendix to the Notice of Appeal itself, but rather to his affidavit in support of his motion to proceed in forma pauperis ("IFP").  Although the IFP application and appendix were filed simultaneously with the Notice of Appeal, Morehouse and Shaffer do not cite any authority (nor are we aware of any) suggesting that the list of issues in an IFP application limits the issues or orders that may be raised on appeal.

Moreover, even if we were to consider Rice's list of issues along with his Notice of Appeal, his failure to specifically cite the April 2015 summary-judgment order is not dispositive. *See Peng v. Mei Chin*

Second, we conclude that Morehouse and Shaffer did not suffer prejudice: they both had an opportunity to, and actually did, fully brief the issue. Although Morehouse and Shaffer argue that they suffered prejudice because of the delay—citing the eleven months between receiving the Notice of Appeal and Rice's opening brief—they do not say how they were harmed. Moreover, given that Rice could not have appealed the order granting partial summary judgment until after judgment was issued following the jury trial three years later,[10] it is hard to see how the relatively brief period of additional time prejudiced them.

---

*Penghu*, 335 F.3d 970, 975 (9th Cir. 2003) (holding that dismissal of the appeal was inappropriate where appellant failed to attach to his notice of appeal the district court's order granting defendant qualified immunity). The cases Morehouse and Shaffer rely on involved notices of appeal with a more explicit accounting of the orders challenged on appeal. *See Havensight Capital LLC v. Nike, Inc.*, 891 F.3d 1167, 1171 (9th Cir. 2018) (concluding that notice of appeal did not intend to appeal unnamed orders where the notice named, cited, and attached other orders); *Valadez-Lopez v. Chertoff*, 656 F.3d 851, 859 n.2 (9th Cir. 2011) (concluding that notice of appeal did not intend to appeal grant of summary judgment in favor of one deputy public defender defendant where the notice specifically named the order granting summary judgment in favor of a different deputy public defender defendant). The notices of appeal in those cases were also filed by represented parties. Even if a reviewing court can ordinarily draw a negative inference from a party's list of the orders he intends to challenge, we decline to apply such an inference to Rice's pro se list of issues in his IFP application.

[10] Morehouse's and Shaffer's argument that Rice should have appealed the grant of partial summary judgment sooner is without merit. A district court's *grant* of summary judgment based on qualified immunity is not reviewable as a "collateral order." *See Branson v. City of Los Angeles*, 912 F.2d 334, 335 (9th Cir. 1990). Moreover, an order granting partial summary judgment is not a final appealable order unless it "has the effect of completely disposing of the action." Charles A. Wright, Arthur R. Miller & Mary K. Kane, 10A Fed. Prac. & Proc.

In sum, Morehouse and Shaffer "had notice of the issue on appeal" and "an opportunity to fully brief the issue." *West*, 853 F.3d at 523–24. Their answering brief on appeal responds fully to Rice's challenge to the district court's order granting partial summary judgment and qualified immunity to Morehouse and Shaffer. *See id.* Accordingly, Rice has sufficiently presented the issue for appeal, *see id.* at 524, which we turn to next.

## III.  STANDARD OF REVIEW

We review de novo a district court's grant of summary judgment. *S.R. Nehad v. Browder*, 929 F.3d 1125, 1132 (9th Cir. 2019). Summary judgment is proper where the movant shows, by citation to the record, that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. *Glenn v. Washington Cnty.*, 673 F.3d 864, 870 (9th Cir. 2011); Fed. R. Civ. P. 56(a), (c). In qualified-immunity cases, "we view the facts in the light most favorable to the nonmoving party." *Tuuamalemalo v. Greene*, 946 F.3d 471, 476 (9th Cir. 2019) (per curiam) (quoting *Plumhoff v. Rickard*, 572 U.S. 765, 768 (2014)). We do not credit a party's version of events that the record, such as an unchallenged video recording of the incident, "quite clearly contradicts." *Scott v. Cnty. of San Bernardino*, 903 F.3d 943, 952 (9th Cir. 2018) (quoting *Scott v. Harris*, 550 U.S. 372, 378 (2007)). We also review de novo an

---

§ 2715 (4th ed.). Here, the district court's order granted summary judgment to Morehouse and Shaffer regarding their take-down of Rice but denied summary judgment on the alleged use of excessive force during the ensuing scrum. Thus, the summary-judgment ruling did not completely dispose of the action as to Morehouse and Shaffer, and Rice could not have appealed the order sooner.

officer's entitlement to qualified immunity. *S.R. Nehad*, 929 F.3d at 1132.

## IV. ANALYSIS

In reviewing whether Morehouse and Shaffer are entitled to summary judgment on the basis of qualified immunity, we ask two questions. *Tuuamalemalo*, 946 F.3d at 476–77; *see also C.V. ex rel. Villegas v. City of Anaheim*, 823 F.3d 1252, 1255 (9th Cir. 2016). First, "[t]aken in the light most favorable to the party asserting the injury, do the facts alleged show the officer's conduct violated a constitutional right?" *Tuuamalemalo*, 946 F.3d at 476 (quoting *Scott*, 550 U.S. at 377). Second, "[i]f the court finds a violation of a constitutional right, the next, sequential step is to ask whether the right was clearly established in light of the specific context of the case." *Id.* (internal quotation marks and ellipses omitted) (quoting *Scott*, 550 U.S. at 377). The district court answered no to both questions. For the reasons that follow, we answer both questions in the affirmative.

## A. EXCESSIVE FORCE

In evaluating a Fourth Amendment claim of excessive force, we ask "whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them." *Graham v. Connor*, 490 U.S. 386, 397 (1989) (citations omitted). "In assessing the objective reasonableness of a particular use of force, we consider: (1) 'the severity of the intrusion on the individual's Fourth Amendment rights by evaluating the type and amount of force inflicted,' (2) 'the government's interest in the use of force,' and (3) the balance between 'the gravity of the intrusion on the individual' and 'the government's need for that intrusion.'" *Lowry v. City of San Diego*, 858 F.3d 1248, 1256 (9th Cir. 2017) (en banc) (quoting *Glenn*, 673 F.3d

at 871). We must judge the reasonableness of a particular use of force "from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Graham*, 490 U.S. at 396.

### 1. The Type and Amount of Force Used

Characterizing the amount of a non-lethal force can often depend on specific factual circumstances. *See, e.g.*, *Lowry*, 858 F.3d at 1256 ("Our precedent establishes that characterizing the quantum of force with regard to the use of a police dog depends on the specific factual circumstances."); *Palmer v. Sanderson*, 9 F.3d 1433, 1436 (9th Cir. 1993) (holding that officer who fastened handcuffs so tightly around plaintiff's wrist that it caused pain and left bruises for weeks was not entitled to qualified immunity). The same is true involving take-downs. *See, e.g.*, *Blankenhorn v. City of Orange*, 485 F.3d 463, 477 (9th Cir. 2007); *Santos v. Gates*, 287 F.3d 846, 855 (9th Cir. 2002).

Morehouse and Shaffer executed the take-down maneuver while holding Rice in a "police lead" position; that is, they tripped Rice so that he would fall to the ground as they held his arms behind his back. Rice explained in his declaration that he was tripped and "forcibly" thrown to the ground, face-first onto the pavement. Due in part to the take-down, Rice declared that he suffered "extreme pain" immediately following his arrest and long-term physical pain for which he received medical treatment. Thus, assuming Rice's version of the material facts viewed in the light most favorable to him, *see Tuuamalemalo*, 946 F.3d at 478, we agree with the district court that Morehouse and Shaffer's take-down involved a "substantial" and "aggressive use" of force. *Cf. Santos*, 287 F.3d at 853 (describing a take-down maneuver as "quite severe"). Its use, like any, "must be justified by the need for the specific

level of force employed." *Bryan v. MacPherson*, 630 F.3d 805, 825 (9th Cir. 2010).

## 2. The State's Interest

Under *Graham*, we evaluate the state's interests at stake by considering "(1) how severe the crime at issue was, (2) whether the suspect posed an immediate threat to the safety of the officers or others, and (3) whether the suspect was actively resisting arrest or attempting to evade arrest by flight." *Mattos v. Agarano*, 661 F.3d 433, 443 (9th Cir. 2011) (en banc). Among these considerations, the "most important" is the second factor—whether the suspect posed an immediate threat to others. *Isayeva v. Sacramento Sheriff's Dep't*, 872 F.3d 938, 947 (9th Cir. 2017). These factors are non-exhaustive, and we examine the totality of the circumstances, *Bryan*, 630 F.3d at 826, including the availability of less intrusive alternatives to the force employed and whether proper warnings were given, *Glenn*, 673 F.3d at 872.

Before turning to these factors, we summarize the "facts and circumstances confronting" Morehouse and Shaffer as they arrived. *Graham*, 490 U.S. at 397. The district court relied heavily on Murakami's Code 3 as communicating a "life-or-death alert" that Morehouse and Shaffer "had no time" to independently evaluate. But the court overlooked Murakami's instructions to the arriving officers that effectively downgraded her Code 3 call.[11] She explained to them that "just one unit's necessary." To justify the need for

---

[11] Indeed, as revealed at trial, Murakami attempted to amend the Code 3 by later radioing a "Code 4" call, which meant "she was no longer in danger." Her "Code 4" update can be heard in the dash-cam video. But because the arriving officers used a different radio frequency than the Idaho State Police, they did not receive the "Code 4" radio update.

limited assistance, she explained "he's just not wanting to comply with my instructions." Murakami then added, with her back to Rice's car, "He's already been told he's under arrest," and "All I wanted was his license, so I'm just going to need somebody to help me get him out of the car." Another officer can be heard responding "okay" to each of Murakami's statements. And based on Morehouse's and Shaffer's declarations, which paraphrase Murakami's comments to the arriving officers, a jury could find that the officers heard those statements. In light of these facts, a jury could reasonably find that Murakami's comments deescalated the nature of the situation and that reasonable officers in the position of Morehouse and Shaffer would not have viewed the situation as a Code 3 event.[12]

In addition, officers have a duty to independently evaluate a situation when they arrive, if they have an opportunity to do so. *See Deorle v. Rutherford*, 272 F.3d 1272, 1277 (9th Cir. 2001) (explaining that officer, although responding to a Code 3 call, had sufficient time to determine whether there was an immediate need to use non-lethal force). A reasonable jury could find that Morehouse and Shaffer had such an opportunity. Morehouse and Shaffer received the radio call for support and drove to the scene minutes later. They were among seventeen officers who responded to the call. Morehouse and Shaffer parked on the opposite side of the road, crossed the median, and approached Murakami's car. From behind Rice's car, they could observe a woman and two teenagers inside the car. After approaching the car, Murakami identified the teenagers as Rice's children. Morehouse, who stood

---

[12] Indeed, as Shaffer suggested at trial, Murakami's comments had precisely that effect. As he explained, "after hearing [Murakami's comments], I kind of – I slowed down a little bit."

immediately behind Murakami, could see Rice roll down his window and could hear Rice ask to speak to Murakami's supervisor. The dash-cam footage shows Rice making this request at least five times. Jt Ex. 1001 at 9:50–10:20. He made those requests calmly, punctuating his requests with "please" and "ma'am" and without raising his voice. Jt Ex. 1001 at 9:50–10:20. Once they walked Rice to the back of his car, Morehouse and Shaffer were among six officers surrounding Rice. Jt Ex. 1001 at 10:30. And by the time Morehouse and Shaffer implemented the take-down, more than a minute had passed since they had first met Murakami at her car. During that brief period, although Rice refused to cooperate, Morehouse and Shaffer did not observe Rice yell or use profanity, attempt to flee or to harm the officers, or reach for any sort of weapon. Thus, a reasonable jury could find that an officer standing in their shoes would have known that they were not facing an emergency situation.

Absent an emergency, the state's interests here are insubstantial. Rice's purported traffic offense—failing to signal for a full five seconds before changing lanes—was minor. *See Bryan*, 630 F.3d at 828 ("Traffic violations generally will not support the use of a significant level of force."). Nor was the offense that Murakami suspected him of—driving under the influence—particularly severe. *See id.* at 829. In any event, Morehouse and Shaffer only knew what they were told, which included Murakami's explanations that Rice was "just not wanting to comply with my instructions" and that "[a]ll I wanted was his license." Given the circumstances and Murakami's explanations, a reasonable jury could find that Morehouse and Shaffer could not reasonably have believed that Rice had committed a serious crime.

Similarly, a reasonable jury could find that Rice did not present an immediate threat to the safety of the officers or others, the most important factor under *Graham*. *See Isayeva*, 872 F.3d at 947. Murakami even turned her back to Rice's car and briefly walked backward as she re-approached the vehicle to arrest him, undermining any suggestion that she believed Rice might have a firearm. Moreover, despite more than a dozen officers arriving at the scene, Murakami then explained she needed only one unit to help remove Rice from his car.[13] That explanation dispelled any notion that Rice was dangerous or that his family warranted additional safety precautions. In addition, Murakami explained that she needed that limited assistance because Rice would not give her his license and was not following instructions. That Murakami did not say or suggest another reason for needing assistance strongly undermines Morehouse's and Shaffer's assertion that they reasonably believed Rice posed an immediate threat to them or others.

Finally, although there is conflicting summary-judgment evidence, a jury could find that Rice was not "actively resisting arrest or attempting to evade arrest by flight." *Mattos*, 661 F.3d at 441. According to Rice's version of the events, he "was not resisting in any way" until after he was taken down. Because the dash-cam video does not clearly contradict Rice's account, we must accept it. *See Scott*, 903 F.3d at 952. We have long distinguished between passive and active resistance, *see Forrester v. City of San Diego*, 25 F.3d 804, 805 (9th Cir. 1994), and Rice's refusals to exit his car are far closer to "the purely passive protestor who simply refuses to stand" than to the "minor" or even

---

[13] As Murakami later explained at trial, she meant only "one person."

"truly active" forms of resistance that we have considered in other cases. *See Bryan*, 630 F.3d at 830 (construing the plaintiff's refusals to remain in his car, even given his shouting and self-hitting, as relatively passive).

In sum, based on our review of the *Graham* factors, a reasonable jury could find that the state had a minimal interest in the use of substantial force against Rice.

We note an additional consideration supporting our conclusion: the officers did not apparently consider "what other tactics if any were available" to effect the arrest. *Bryan*, 630 F.3d at 831 (quoting *Headwaters Forest Def. v. Cnty. of Humboldt,* 240 F.3d 1185, 1204 (9th Cir. 2000)). The officers apparently planned to arrest Rice while holding him, standing up, in a "police lead" position. Shaffer stepped in once he noticed that Murakami lost her grip of Rice's left arm. But Morehouse and Shaffer do not explain why they, despite being able to hold Rice in a police lead position, could not have arrested Rice in the way they first planned. Morehouse and Shaffer assume (as we cannot at this stage) that Rice was resisting Murakami's attempts to hold him. *Cf. Tuuamalemalo*, 946 F.3d at 478 ("At this stage of the proceedings, we must assume that Tuuamalemalo was not resisting when Officer Greene used a chokehold on him."). Although officers "need not avail themselves of the least intrusive means of responding to an exigent situation," their failure to consider "clear, reasonable and less intrusive alternatives" to the force employed "militates against finding the use of force reasonable." *Glenn*, 673 F.3d at 876 (internal quotation marks and alterations omitted).

### 3. Balancing the Competing Interests

In light of all the circumstances, a reasonable jury could conclude that Morehouse's and Shaffer's use of substantial

force against Rice outweighed the officers' need for its use. *See Lowry*, 858 F.3d at 1256.

The balance here is similar to *Bryan*, where we considered the use of a taser at a traffic stop for Carl Bryan's failure to wear his seatbelt. 630 F.3d 805. Bryan, upset after a long drive and receiving a speeding ticket earlier that night, hit his steering wheel and yelled expletives to himself. *Id.* at 822. Bryan also stepped out of his car unprompted. *Id.* He did not verbally threaten the officer, was standing at least twenty feet away and did not attempt to flee. *Id.* The officer instructed Bryan to get back in the car, which he did not do. *Id.* Bryan later said he did not hear the officer's instructions. *Id.* Bryan also said he remained still, but the officer testified that Bryan took "one step" toward him. *Id.* As a result, and without warning, the officer shot Bryan with a taser gun, and he fell face-first into the ground, fracturing his teeth and suffering facial contusions. *Id.*

Applying *Graham*'s three-step balancing framework, we held that the officer's use of force against Bryan was excessive because (1) the arresting officer used an "intermediate or medium, though not insignificant, quantum of force"; (2) although Bryan's erratic behavior could lead an officer to be wary, he did not pose an immediate threat to the officer, his traffic violation did not support the use of a significant level of force, his failure to return to his car constituted at most passive resistance, and the officer failed to warn Bryan about the taser or to seek a less intrusive alternative; and (3) on balance, the state's "minimal interest" in the use of force against Bryan did not justify the use of "intermediate level of force" against him. *Id.* at 824–32.

There are several clear parallels in this case to the balance we struck in *Bryan*. First, Morehouse's and Shaffer's use of the take-down maneuver involved

"substantial" force that resulted in forcibly throwing Rice face-first to the pavement, similar to the non-lethal force in *Bryan.* Second, similar to *Bryan*, Rice's behavior did not constitute an immediate threat to the officers; his traffic violation did not support the use of a significant level of force; Rice's refusal to get out of his car did not constitute active resistance; and officers failed to attempt a less intrusive alternative. Finally, on balance, a reasonable jury could find that the state's minimal interest in the use of force against Rice did not justify the "substantial force" used against him.

In disagreeing, Morehouse and Shaffer rely on the unrebutted testimony of use-of-force expert Scot Haug, who opined that both officers acted "reasonably, appropriately, and in conformance with their training" throughout the incident. Haug's analysis, however, depends on two factual issues that are genuinely disputed. First, Haug broadly relies on the Code 3 call, which Haug characterizes as "the most exigent of assistance calls" and which "would have reasonably put [Morehouse and Shaffer] on guard concerning their safety." But Haug, like the district court, fails to recognize how Murakami's comments to the arriving officers effectively downgraded the Code 3 call. A reasonable jury could find that Morehouse and Shaffer both heard Murakami's comments and knew that the circumstances no longer presented an urgency.

Second, Haug's opinion relies on his conclusion that Rice was physically resisting his arrest. But as noted above, that issue is genuinely disputed and not directly resolved by the dash-cam video. Thus, Haug's ultimate conclusions regarding the propriety of the take-down depends on two critical factual issues that cannot be resolved at summary judgment. "Where such disputes exist, summary judgment

is appropriate only if [Morehouse and Shaffer] are entitled to qualified immunity on the facts as alleged by [Rice]." *See Blankenhorn*, 485 F.3d at 477.

In sum, although there are material facts in dispute, when the facts are taken in the light most favorable to Rice, a jury could conclude that Morehouse and Shaffer used excessive force in violation of the Fourth Amendment. Thus, we turn to the second prong of the qualified-immunity analysis.

## B. CLEARLY ESTABLISHED LAW

The district court held that even if Morehouse and Shaffer used excessive force, they were entitled to qualified immunity. Accordingly, we consider whether Rice's right to be free from Morehouse's and Shaffer's substantial force in implementing the take-down "was clearly established . . . in light of the specific context of the case." *Tuuamalemalo*, 946 F.3d at 477 (quoting *Scott*, 550 U.S. at 377).

To be clearly established, "[t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Anderson v. Creighton*, 483 U.S. 635, 640 (1987). The Supreme Court has repeatedly cautioned us "not to define clearly established law at a high level of generality." *City of Escondido, Cal. v. Emmons*, 139 S. Ct. 500, 503 (2019) (quoting *Kisela v. Hughes*, 138 S. Ct. 1148, 1152 (2018)). "To determine whether [an officer] violated clearly established law, we look to cases relevant to the situation [the officer] confronted, mindful that there need not be a case directly on point." *A.K.H. rel. Landeros v. City of Tustin*, 837 F.3d 1005, 1013 (9th Cir. 2016) (citations and internal quotation marks omitted). "[E]xisting precedent must place the lawfulness of the particular [action] beyond debate," for which "a body of relevant case law is usually necessary."

*Emmons*, 139 S. Ct. at 504 (quoting *D.C. v. Wesby*, 138 S. Ct. 577, 581 (2018)).

Long before Rice's arrest, we clearly established one's "right to be free from the application of non-trivial force for engaging in mere passive resistance." *Gravelet-Blondin v. Shelton*, 728 F.3d 1086, 1093 (9th Cir. 2013); *see also Nelson v. City of Davis*, 685 F.3d 867, 881 (9th Cir. 2012) (explaining that cases dating back to 2001 established that "a failure to fully or immediately comply with an officer's orders neither rises to the level of active resistance nor justifies the application of a non-trivial amount of force"). In *Gravelet-Blondin*, we held that an officer's tasing of a bystander to an arrest who did not retreat despite the officer's orders violated clearly established law. 728 F.3d at 1092–96. Because the plaintiff did not make any threats or resist the officer, under our case law, "the use of non-trivial force *of any kind* was unreasonable." *Id.* at 1094 (emphasis added).

In *Gravelet-Blondin*, we discussed two cases that clearly established the right to be free from any kind of non-trivial force where the plaintiff either did not resist or only passively resisted the officer. We cited *Deorle*, in which we denied qualified immunity to an officer who shot a beanbag projectile at a suicidal and irrational individual who followed the officer's instructions to put down his crossbow but who then walked towards the officer at a steady gait. 272 F.3d at 1277, 1281. We also cited *Headwaters Forest Defense*, where we considered the use of pepper spray to subdue, remove, or arrest nonviolent protesters and held that "[t]he law regarding a police officer's use of force against a passive individual was sufficiently clear" in 1997 to put officers on notice that such force was excessive. 276 F.3d at 1131. Both cases bear on Morehouse's and Shaffer's conduct towards

Rice, who, taking his version of the incident as true, was at most passively resistant.

Similarly, in *Nelson*, we cited several cases that held that non-trivial force was not justified in the face of passive or even minimal resistance. 685 F.3d at 881–82. In *Young v. County of Los Angeles*, for example, we denied qualified immunity to an officer who physically struck and used pepper spray against an arrestee who refused to reenter his vehicle, 655 F.3d 1156, 1158 (9th Cir. 2011), holding that "[t]he principle that it is unreasonable to use significant force against a suspect who was suspected of a minor crime, posed no apparent threat to officer safety, and could be found not to have resisted arrest" was well established long before 2007. *Id.* at 1168. Similarly, as discussed, in *Bryan*, we held that it was excessive for an officer to use a taser against a person who, although shouting gibberish, hitting himself, and disobeying the officer's instructions to reenter his car, was otherwise non-resistant. 630 F.3d 805.

Cases like *Deorle*, *Headwaters*, *Young*, and *Bryan*—as summarized in *Gravelet-Blondin* and *Nelson*—sufficiently established the law before Rice's arrest in 2011. These cases form a "body of relevant case law" that together place Morehouse's and Shaffer's use of substantial force against a passively resisting person "beyond debate." *Emmons*, 139 S. Ct. at 504. Accordingly, qualified immunity must be denied.

Morehouse's and Shaffer's reliance on the Supreme Court's recent decision in *Emmons* is misplaced.

In *Emmons*, the Supreme Court vacated our decision denying summary judgment and qualified immunity to an officer who, responding to a domestic abuse call, tackled Marty Emmons as he exited an apartment. *Id.* at 502. In

denying the officer qualified immunity, we said that the "right to be free of excessive force was clearly established" at the time of Emmons's arrest in 2013. *Emmons v. City of Escondido*, 716 F. App'x 724, 725 (9th Cir. 2018) (citing *Gravelet-Blondin*, 728 F.3d at 1093). The Supreme Court rejected that formulation as "far too general." 139 S. Ct. at 503. The Court acknowledged the right described in *Gravelet-Blondin* to be "free from the application of non-trivial force for engaging in mere passive resistance," but rejected that case law as inapposite because it involved uses of force "against individuals engaged in *passive* resistance." *Id.* (emphasis in original). Accordingly, the Court remanded for us to consider whether the officer was entitled to qualified immunity. *Id.* at 504.

On remand, we continued to cite favorably our holding in *Gravelet-Blondin*. *See Emmons v. City of Escondido*, 921 F.3d 1172, 1175 (9th Cir. 2019). But to reconcile the Supreme Court's decision with *Gravelet-Blondin*—a case with which the Court did not take issue—we concluded that the Court "must have concluded implicitly that [Emmons]'s actions involved more than passive resistance." *Id.* In particular, we noted the Supreme Court's emphasis that Emmons was a potential suspect (for domestic abuse) and was attempting to flee. *Id.* at 1174–75 (citing *Emmons*, 139 S. Ct. at 504). That distinction was critical and led us to hold that *Gravelet-Blondin* (and the line of cases leading up to it) was not sufficiently on point regarding Emmons's take-down. *Id.* at 1175. We were otherwise unable to find a case sufficiently on point, and we held that the officer was thus entitled to qualified immunity. *Id.*

In contrast, here, taking Rice's version of the events as true, Rice was engaged in mere passive resistance. To be sure, Rice repeatedly declined to provide his license and

other documents to Murakami and to exit his car. But Rice gave Murakami his name, rolled down the window, and attempted to gather his license before he was pulled out of his car. Rice also unlocked the car and did not physically resist arrest before he was taken to the ground. Although Rice was upset and insistent in wanting to speak with Murakami's supervisor, Rice did not swear or threaten any of the officers. Thus, like the plaintiff in *Gravelet-Blondin*—and unlike the plaintiff in *Emmons*—Rice was "perfectly passive, engaged in no resistance, and did nothing that could be deemed particularly bellicose." *Gravelet-Blondin*, 728 F.3d at 1092 (internal quotation marks omitted). Accordingly, the line of cases discussed in *Gravelet-Blondin* clearly established the law long before Morehouse's and Shaffer's take-down of Rice.

## V. CONCLUSION

Viewing the facts, as we must, in the light most favorable to Rice, we conclude that a reasonable jury could find that Rice engaged in passive resistance and that Morehouse's and Shaffer's take-down of Rice involved unconstitutionally excessive force. Furthermore, because the right to be free from "the application of non-trivial force for engaging in mere passive resistance" was clearly established before December 2011, Morehouse and Shaffer are not immune from suit. Accordingly, we **REVERSE** the district court's grant of summary judgment to Morehouse and Shaffer on the basis of qualified immunity and **REMAND** for further proceedings consistent with this opinion.

**REVERSED** and **REMANDED**.