NOT FOR PUBLICATION

FILED

UNITED STATES COURT OF APPEALS

FOR THE NINTH CIRCUIT

SEP 12 2023

MOLLY C. DWYER, CLERK
U.S. COURT OF APPEALS

| | |
|---|---|
| LISA YEARICK, individually, as Personal Representative of the Estate of Edward Rudhman, and on behalf of Leigha Huber, statutory beneficiary; LEIGHA HUBER,<br><br>        Plaintiffs-Appellants,<br><br>  v.<br><br>ROBERT LEATHAM, Sergeant, husband; KRISTY LEATHAM, wife; RYAN KELLEHER, Sergeant, an unmarried individual; PHILIP ASIEDU-DARKWA, Deputy, husband; MORCELIA ASIEDU-DARKWA, wife; PAUL PENZONE, Sheriff, in his Official Capacity,<br><br>        Defendants-Appellees. | No.    22-16310<br><br>D.C. No. 2:20-cv-00545-SPL<br><br>MEMORANDUM[*] |

Appeal from the United States District Court
for the District of Arizona
Steven Paul Logan, District Judge, Presiding

Argued and Submitted July 12, 2023
San Francisco, California

Before:  S.R. THOMAS, BENNETT, and H.A. THOMAS, Circuit Judges.
Dissent by Judge BENNETT.

---

        [*]    This disposition is not appropriate for publication and is not precedent except as provided by Ninth Circuit Rule 36-3.

Lisa Yearick and Leigha Huber (collectively, Appellants) appeal the district court's grant of summary judgment to Appellees Sergeant Robert Leatham, Sergeant Ryan Kelleher, and Deputy Philip Asiedu-Darkwa (collectively, Appellees or officers) on all of the claims in their operative complaint: (i) excessive force in violation of the Fourth Amendment, (ii) wrongful death, pursuant to Ariz. Rev. Stat. § 12-611, and (iii) interference with familial association in violation of the Fourteenth Amendment.

We have jurisdiction pursuant to 28 U.S.C. § 1291. We review the district court's grant of summary judgment, including its qualified immunity determinations, de novo, *Hughes v. Rodriguez*, 31 F.4th 1211, 1218 (9th Cir. 2022), and may affirm "on any ground finding support in the record," *M & T Bank v. SFR Invs. Pool 1, LLC*, 963 F.3d 854, 857 (9th Cir. 2020) (quoting *Cairns v. Franklin Mint Co.*, 292 F.3d 1139, 1155 n.14 (9th Cir. 2002)). "To determine whether the officers are entitled to qualified immunity, we consider (1) whether there has been a violation of a constitutional right; and (2) whether that right was clearly established at the time of the officer's alleged misconduct." *O'Doan v. Sanford*, 991 F.3d 1027, 1036 (9th Cir. 2021) (internal quotation mark omitted). Where there are material factual disputes, we "view the facts and draw reasonable inferences in favor of the nonmoving party," *id.* at 1035, unless the party's allegations are "blatantly contradicted by the record," *Scott v. Harris*, 550 U.S.

2

372, 380 (2007). We affirm in part, reverse in part, and remand.[1]

1. Appellants contend that (i) the decedent, Edward Rudhman, was "walking toward the officers with his arms by his sides and his gun dangling from his right hand," (ii) the gun was swinging lightly in Rudhman's hand, and (iii) Rudhman "never raised the gun or pointed it at anyone." Because we find that the record does not blatantly contradict this view of the facts, *id.*, we assume, for purposes of this appeal, that "Rudhman's arms stayed by his side as he walked, . . . the gun was consistently aimed at the ground, and . . . he never raised or pointed the gun at the officers."

2. Against these facts, we disagree with the district court's determination that Appellees were entitled to qualified immunity on the ground that their use of force was objectively reasonable. *Graham v. Connor*, 490 U.S. 386 (1989) directs us to consider, in assessing the government's use of force, (i) the severity of the suspected crime, (ii) whether Rudhman posed an immediate threat to the officers' safety, and (iii) whether Rudhman was actively resisting or attempting to evade arrest. *See Rice v. Morehouse*, 989 F.3d 1112, 1121 (9th Cir. 2021). The most important of these factors is the second. *Id.* While the Fourth Amendment does not require that officers "delay their fire until a suspect turns his weapon on them," we have also held that the use of deadly force is not rendered "per se reasonable under

---

[1] Because the parties are familiar with the facts, we do not recount them here.

the Fourth Amendment" because a suspect is armed with a deadly weapon. *George v. Morris*, 736 F.3d 829, 838 (9th Cir. 2013). Instead, we must examine whether an armed individual has made "a furtive movement, harrowing gesture, or serious verbal threat [that] might create an immediate threat." *Id.*

Although the first *Graham* factor clearly favors Appellees—who knew that Rudhman possessed a gun, had repeatedly fired it, kicked in Yearick's bedroom door, and threatened to kill their pets—the second and third factors favor Appellants on a summary judgment analysis.

A reasonable jury could find that Rudhman did not make a furtive movement, harrowing gesture, or serious verbal threat during his confrontation with the officers, and that Rudhman therefore did not pose an immediate threat to the officers' safety. The second, and most important, *Graham* factor thus favors Appellants. *See Peck v. Montoya*, 51 F.4th 877, 888 (9th Cir. 2022) ("[W]here, as here, a jury could find that no [furtive movement, harrowing gesture, or serious verbal threat] occurred, our cases clearly establish that the use of deadly force would be impermissible.").

As to the third factor, while Rudhman verbally refused to follow the officers' commands, a reasonable jury could find that his resistance was not particularly active. *See Bryan v. MacPherson*, 630 F.3d 805, 822, 829–30 (9th Cir. 2010) (suspect's resistance was "closer to . . . passive," though he failed to comply

4

with an officer's order to stay in his car, while yelling "gibberish" and hitting himself in the thighs). A reasonable jury could also conclude that, although Rudhman continued to walk toward the officers with a gun after being told to stop, he did not attack, struggle with, threaten, or run from the officers, or actively attempt to evade arrest. *See*, *e.g.*, *Smith v. City of Hemet*, 394 F.3d 689, 703 (9th Cir. 2005) (en banc) (suspect's resistance was not "particularly bellicose"; though he "continually ignored . . . officers' requests to remove his hands from his pajamas . . . [and] refused to place both his arms behind his back," he did not attack, threaten, or run from the officers); *cf. Mattos v. Agarano*, 661 F.3d 433, 446 (9th Cir. 2011) (en banc) (suspect "actively resisted arrest insofar as she refused to get out of her car when instructed to do so and stiffened her body and clutched her steering wheel to frustrate the officers' efforts to remove her from her car").

Because the latter two factors favor Appellants, the balancing of the *Graham* factors "does not clearly favor" the officers. *See Seidner v. de Vries*, 39 F.4th 591, 601 (9th Cir. 2022). Moreover, the additional factors of (i) Rudhman's mental state, (ii) the availability of less-lethal force, and (iii) the officers' failure to warn Rudhman that he would be shot, do not tip this analysis in the officers' favor. *See Rice*, 989 F.3d at 1121–22 (calling for an examination of "the totality of the circumstances" under *Graham*). A jury could therefore conclude that the officers' decision to shoot Rudhman was not objectively reasonable and that, by shooting

Rudhman, the officers violated his Fourth Amendment right to be free of excessive force.

3. We nevertheless affirm the district court's grant of summary judgment to Appellees as to Appellants' excessive force claim. *See Shafer v. County of Santa Barbara*, 868 F.3d 1110, 1115 (9th Cir. 2017) (both prongs of the qualified immunity analysis must be satisfied to overcome a qualified immunity defense). Taking the facts in the light most favorable to Appellants, Rudhman's right to be free of deadly force under the circumstances presented here was not "clearly established" at the time of the shooting. *Andrews v. City of Henderson*, 35 F.4th 710, 718 (9th Cir. 2022).

Appellants urge us to rely upon *George*, *Estate of Lopez by & through Lopez v. Gelhaus*, 871 F.3d 998 (9th Cir. 2017), *C.V. by & through Villegas v. City of Anaheim*, 823 F.3d 1252 (9th Cir. 2016), and *Curnow by & through Curnow v. Ridgecrest Police*, 952 F.2d 321 (9th Cir. 1991), for the notion that Rudhman's right to be free of deadly force was clearly established. But the circumstances of these four cases differ materially from the circumstances at issue here and do not place the constitutional question beyond debate. *See District of Columbia v. Wesby*, 583 U.S. 48, 64 (2018) (while there need not be "a case directly on point," appellants must identify a case in which "officer[s] acting under similar circumstances . . . [were] held to have violated the Fourth Amendment").

6

Whereas the suspect in *George* was standing still on a balcony with his gun pointed at the ground, 736 F.3d at 832–33, Rudhman was walking toward the officers while verbally refusing their commands. Unlike the decedent in *Gelhaus*, who did not know that he was being addressed by law enforcement officers and was not moving toward the officers, 871 F.3d at 1010, Rudhman verbally rejected officers' commands to drop his gun and continued to walk in the officers' direction. While the decedent in *Villegas* was attempting to comply with the responding officers' commands, 823 F.3d at 1256, Rudhman, again, was verbally rejecting the officers' commands and slowly closing the gap between them and him. And unlike the decedent in *Curnow*, who was not facing officers at the time he was first shot, 952 F.2d at 325, Rudhman was not only facing the officers, but advancing toward them while refusing their commands to stop. Because of the differences between the circumstances of these cases and the circumstances here, these cases would not have put Appellees on notice of Rudhman's right to be free of deadly force under the circumstances. The district court therefore properly granted summary judgment to Appellees as to Appellants' Fourth Amendment excessive force claim.

4. Appellants' state law wrongful death claim is governed by the same reasonableness standard that governs the first prong of the qualified immunity analysis. *See* Ariz. Rev. Stat. § 13-410(C)(1) (stating that an officer's use of deadly

force against another is justified when the officer "reasonably believes that it is necessary . . . [t]o defend himself or a third person from what the . . . officer reasonably believes to be the . . . imminent use of deadly physical force"; *Longoria v. Pinal Cnty.*, 873 F.3d 699, 711 (9th Cir. 2017) ("Because we find a material dispute of facts as to whether or not [the officer's] use of deadly force was reasonable, we reverse the district court's grant of summary judgment in the state cause of action [under Ariz. Rev. Stat. § 12-611] as well.")). Because, for the reasons explained above, a jury could conclude that the officers' decision to shoot Rudhman was not objectively reasonable, we reverse the district court's grant of summary judgment to Appellees on Appellants' wrongful death claim. We do not, however, decide that the officers' use of force violated Arizona law—only that, on this record, the officers are not entitled to summary judgment on this claim. We assume, moreover—as did the district court—that this claim was based on the intentional tort theory of battery. We remand for further proceedings with respect to this claim only.[2]

**AFFIRMED in part, REVERSED in part, and REMANDED.**

---

[2] At oral argument, Appellants abandoned their challenge to the district court's determination regarding Appellants' Fourteenth Amendment familial association claim.

*Lisa Yearick v. Robert Leatham*, No. 22-16310
BENNETT, Circuit Judge, dissenting:

I would affirm the district court's grant of summary judgment on the Arizona wrongful death claim, and thus affirm the district court's summary judgment grant in its entirety. Based on the undisputed and indisputable facts in the record, the actions of Sergeant Robert Leatham, Sergeant Ryan Kelleher, and Deputy Philip Asiedu-Darkwa (the "officers") did not violate any constitutional right of the deceased, Edward Rudhman. The officers' conduct was objectively reasonable under Arizona law given the obvious imminent threat and clear and present danger to the lives of the officers and others. Thus, I respectfully dissent, in part.

Under A.R.S. § 13-410, an officer's use of deadly force against another is justified when the officer "reasonably believes that it is necessary . . . [t]o defend himself or a third person from what the . . . officer reasonably believes to be the use or imminent use of deadly physical force." A.R.S. § 13-410(C)(1). The parties here agree that if an officer's conduct is objectively reasonable under *Graham v. Connor*, 490 U.S. 386 (1989), in determining qualified immunity, it is also objectively reasonable under Arizona state law.[1]

---

[1] *See also Quinn v. Cardenas*, No. 1 CA-CV 22-0398, 2023 WL 4880442, at *5–9 (Ariz. Ct. App. Aug. 1, 2023) (holding that federal-law determinations in a qualified immunity analysis can have issue-preclusive effect on state law claims).

The majority correctly looks to the objective reasonableness standard set out in *Graham*. But the *Graham* inquiry "must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Id.* at 396. "The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Id.* at 396–97.

The majority recognizes that the second *Graham* factor related to the state's interest—whether the suspect poses an immediate threat to the safety of the officers or others, *Rice v. Morehouse*, 989 F.3d 1112, 1121 (9th Cir. 2021)—is the most important, but fails to recognize that not every use of force violates the law even when "it may later seem unnecessary in the peace of a judge's chambers." *Graham*, 490 U.S. at 397. In both the real world, and the world of judges looking back at officers' actions, Rudhman's conduct posed a grave and immediate danger to the lives of the officers and many others. Rudhman's death was a tragedy. But the officers faced split-second decisions bearing on the possibility of a tragedy of even greater proportions. And no one knows what would have happened had the officers not fired on Rudhman when they did.

Viewed in any light, Rudhman posed an "immediate threat" to his wife, the officers, and others nearby. When they fired, the officers knew that Rudhman was

2

intoxicated, had kicked in the door to the bedroom that his wife was hiding in, had threatened to kill his pets and himself, and had fired his .357 <u>six times</u> at an unknown target or targets. As the district court described:

> [A] family of four lived in a recreational vehicle on the property. They had heard the six gunshots fired by Mr. Rudhman in the backyard and took cover inside. A next-door neighbor who was outside also heard the gunshots. He took cover in a workshop located on his property.

The officers had probable cause to believe that Rudhman had committed and was continuing to commit serious felonies—including domestic violence, endangerment, and unlawful discharge of a firearm.[2] The officers also had probable cause to believe that Rudhman's domestic violence offense was "especially egregious" and that he was "particularly dangerous," as he had a gun in his possession, both of which bear on our analysis under the second *Graham* factor. *See Smith v. City of Hemet*, 394 F.3d 689, 702 (9th Cir. 2005) (en banc). "When officers respond to a domestic abuse call, they understand that violence may be lurking and explode with little warning. Indeed, more officers are killed or injured on domestic violence calls than on any other type of call." *Mattos v. Agarano*, 661 F.3d 433, 450 (9th Cir. 2011) (en banc). And again, here, those at risk of being shot and killed by Rudhman included his wife; the family of four that

---

[2] All these crimes are felonies under Arizona state law. *See* A.R.S. § 13-3601(A)(1) (domestic violence); *id.* § 13-1201(A) (endangerment); *id.* § 13-3107(A) (unlawful discharge of a firearm).

lived on the property; neighbors, including those who had heard the six shots Rudhman had already fired; the defendant officers; and their other colleagues on-scene.

When Rudhman stepped out of the house, he ignored the officers' five separate commands to come out without the gun.[3] Despite Rudhman's noncompliance, the officers did not immediately shoot Rudhman as he carried the loaded .357 while steadily advancing toward them—the officers told him four times to drop his gun and once to stop advancing.[4] Rudhman did not simply ignore the multiple commands—he specifically and clearly rejected them as he continued

---

[3] Once the officers were positioned outside the house, Sergeant Leatham made five announcements on the public address system of his vehicle over approximately three minutes, asking Rudhman to come out of the house without the gun.

[4] As the district court recounted:

Over the course of twenty-four seconds, Mr. Rudhman continued to walk directly toward the officers, closing the distance by approximately forty feet. Sergeant Leatham gave five non-amplified verbal commands, each approximately three to four seconds apart:

18:29 (first command): "Edward, drop the gun."
18:32 (second command): "Drop the gun, Edward."
18:35 (third command): "Drop the gun, Edward."
18:39 (fourth command): "Drop the gun, Edward."
18:43 (fifth command): "Stop where you're at."

to advance on the officers, .357 in hand: "I can't do that . . . no I'm not stopping right there"; "[t]hat's not going to happen."

Many lives were at risk here, though the officers' most of all. In context, the officers waited a long time before firing, with every second increasing *their* mortal danger. Neither federal nor analogous Arizona law requires officers to "delay their fire until a suspect turns his weapon on them." *See George v. Morris*, 736 F.3d 829, 838 (9th Cir. 2013). And, of course, here, not just the officers were in range.

So, here, the officers will unjustifiably face trial. And the majority offers no guidance on what officers are supposed to do in the future in a similar situation. Should they have waited one more second? Should they have waited until Rudhman started to raise the weapon? Of course, had they done that, one or more of them, or others, might well have been shot and killed. There are close cases. And there are cases that are close to close cases. This case is neither. This case has the archetypal "tense, uncertain, and rapidly evolving" circumstances that call for "split-second judgments" from officers. *Graham*, 490 U.S. at 397.[5] Because the undisputed record demonstrates that Rudhman posed an immediate threat to the safety of the officers and others, I would conclude that the "most important" *Graham* factor favors the officers. *Rice*, 989 F.3d at 1121. Thus, like the district

---

[5] Or as the district court correctly and aptly noted: "This Court will not—indeed, it *cannot*—judge Defendants' decision 'with the 20/20 vision of hindsight.'" (quoting *Graham*, 490 U.S. at 396).

5

court, I would hold that the officers are entitled to a grant of summary judgment on the first prong of the qualified immunity test as well as the second, and that the officers are entitled to a grant of summary judgment on the state-law wrongful death claim.